**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| IN RE: | ) |
| | ) |
| NORTH SHORE MANOR, INC. | ) Case No. 23-10809-JGR |
| | ) |
| Debtor. | ) Chapter 11 |
| | ) |

**COLUMBINE MANAGEMENT SERVICES, INC.'S PRELIMINARY RESPONSE TO MOTION TO COMPEL TURNOVER OF ESTATE PROPERTY**

Columbine Management Services, Inc. ("CMS") by and through its attorneys, John O'Brien of Spencer Fane LLP for its Preliminary Response To Motion To Compel Turnover Of Estate Property states as follows:

1. CMS received notice of the bankruptcy and received a copy of the motion for turnover on March 6, 2023 at 1:59. This is CMS's preliminary response to the Debtor's Motion to Compel Turnover.

2. Contrary to the impression the Debtor wants to give, the problem turning over records rests with the Debtor. CMS is anxious to part ways with the Debtor as quickly as possible, to include handing off the records.

3. The Debtor's motion for expedited Entry of Orders tells quite a tail demonizing CMS and Robert Wilson with the objective of stampeding readers into blaming someone else for the Debtor's failures.

4. The Debtor owns a 120-bed skilled nursing facility ("SNF") with approximately 104 residents. The residents require daily healthcare services.

1

5. CoVid had a material adverse on effect the Debtor for all of the reasons reported in the press describing outbreaks at SNF's. It became more difficult to hire staff and to profitably provide SNF services.

6. Federal CoVid relief money kept many SNF afloat, including North Shore Manor. Those federal programs have stopped.

7. The Debtor North Shore Manor, Inc ("NSM") operates the facility and leases the facility from North Shore Associates ("NSA") which is the other Debtor.

8. NSM and NSA have identical ownership. Each shareholder of NSM owns the exact same percentage of NSA.

9. Historically, NSM paid rent to NSA which NSA used to service the mortgage debt owed to the Bank of Oklahoma and to pay substantial dividends to NSA partners. Rent payments were used to funnel dividends to the owners of both Debtors.

10. When Covid hit there was no money to pay dividends. The shareholders did not like this.

11. CMS's owner, Robert Wilson, gave NSM a line of credit so NSM could pay rent and dividends to shareholders. Eventually Mr. Wilson stopped lending NSM money to fund dividends. Mr. Wilson continued to support the company financially, but stopped funding the payment of dividends.

12. Mr. Wilson owns several healthcare facilities and decided to sell out. Mr. Wilson also owns 15% of the Debtor. Although NSM had no tag-along rights Mr. Wilson tried to include the Debtor's assets in the sale by offering to buy out the other shareholders if M.r Wilson could find a qualified buyer for all of the facilities. But a buyer was not found.

13. With no buyer is sight, Mr. Wilson informed NSM shareholders that Mr. Wilson could not continue to fund NSM's operating losses. Mr. Wilson asked all NSM's shareholders to participate in a capital call. They refused.

14. The NSM shareholders inherited their shares long ago. They got accustomed to receiving regular dividends. Then Covid hit. The concept of recapitalizing NSM was unacceptable to them. Although NSM shareholders are sophisticated with inherited wealth their objective is to receive dividends, and not recapitalization.

15. After the dividends stopped, NSM shareholders elected Mayer Kohn ("Kohn") as their new president. Kohn is an attorney and a son of NSM's largest shareholder. Kohn turned on Mr. Wilson. He demanded that Mr. Wilson buy his father's and other shareholders' shares for more than they are worth or he would put NSM in bankruptcy and harm Mr. Wilson's reputation. He noted that only Mr. Wilson had personally guaranteed the Debtor's debts to the Bank of Oklahoma and to the First National Bank of Omaha, and this was another bargaining chip Kohn played to demand that Mr. Wilson purchase his father's shares for mort than they are worth.

16. At the same time, Kohn implemented a policy to slow pay vendors to stockpile cash in anticipation of a bankruptcy filing. In a nutshell, instead or repaying dividends to recapitalize the company, Kohn found it more convenient to obtain working capital by stiffing trade creditors through the bankruptcy process. The shareholders could recapitalize NSM, but instead choose to stiff vendors and risk the welfare of the residents.

17. In furtherance of this objective, Kohn took over $50,000 from NSM's operating account to pay retainers for bankruptcy professionals. This left NSM very close to not having sufficient funds to meet March 6, 2023 payroll. If payroll was not met the staff would leave, and the residents' welfare would suffer.

18. Kohn decided to stiff many vendors, including CMS which was not paid its management fee for the month of January.

19. It became apparent to Mr. Wilson that Kohn's personal objectives are inconsistent with the welfare of the residents and the best interest of creditors.

20. Moreover, NSM's facility operates under CMS's management, and Kohn's actions trigger potential liability to CMS.

21. CMS wants no part of Kohn's business practices and terminated its Management Agreement with NSM.

22. NSM gave notice of termination of the Management Agreement by letter sent on Friday, February 24, 2023. Notice was given to Debtor's counsel and to all known addresses for NSM and its shareholders. Notice was given late in the day on Friday, February 24, but there was not sufficient time to send certified letters on that day. Notice was sent by certified mail on Monday, February 27, 2023.

23. Under the Management Agreement, termination is effective 15 days after notice if termination is due to nonpayment management fees. Therefore, termination is effective as early as midnight, March 11, 2023.

24. Having stated this, CMS cares about the residents. The Debtor has not found a replacement manager. CMS will temporarily remain only as long as absolutely needed, but it must be paid for its work. There does not appear to be a line item in the Debtor's budget to pay CMS.

25. To be clear, CMS wants to disengage with the Debtor as soon as possible. Kohn's business practices are unacceptable to CMS and place the residents' welfare at risk. CMS wants to part ways with Kohn.

26. The Debtor is denying CMS access to the facility, which is fine with CMS. Although CMS wants out immediately it will cooperate in a smooth transition for the welfare of the residents. But CMS cannot be responsible for the welfare of the residents in light of Kohn and NSM's actions barring CMS from access to facility and the residents.

27. All these problems and risk to residents fall squarely on Kohn's decision to not recapitalize NSM by returning the dividends he took.

28. CMS does not believe that NSM can become cash flow positive without a recapitalization by shareholders. The money stockpiled by stiffing prepetition vendors will only go so far. The Debtor needs a substantial recapitalization from shareholders, and the shareholders refuse to meet this burden. CMS recommends that the Debtor budget for the inevitable expense of safely and soundly relocating residents before the inevitable welfare crisis develops.

29. Turning now to the records, NSM's records include resident information covered by the Health Insurance Portability And Accountability Act of 1996 (commonly known as "HIPPA"), and State law protecting resident's confidentially. Generally, such records are turned over to licensed healthcare management companies, and not to just anyone. And by law the recipient of the resident healthcare records needs to store the records for 10 years.

30. CMS has asked repeatedly the Debtor to identify a new licensed manager for the facility. CMS has not done so. CMS is not sure if the facility is currently operating in compliance with law.

31. CMS repeatedly stated to the Debtor that it would cooperate in a record transfer, most of which records are in electronic form or available though vendor portals. CMS repeatedly asked the Debtor to identify a person to whom the records could be sent.

32. Finally, on March 6, 2023 at 1:34 p.m. the Debtor identified a person to whom the records should be electronically transferred. Specifically, the Debtor identified Joe Forsstrom at EisnerAmper. Mr. Forsstrom appears to be an accountant and not a licensed healthcare facility operator. It is unknown if Mr. Forsstrom knows his obligations under HIPAA and State law. But if the Debtor wants resident healthcare records to go to Mr. Forsstrom that is fine with CMS. Mr. Forsstrom has been notified of his HIPAA and State law obligations.

33. Next, NSM filed bankruptcy the day after NSM identified Forsstrom as the designated recipient of the records. NSM tells the court that CMS has "refused" to turn over records. This is not so. The Debtor did not identify anyone to receive the records until the day prior to the petition. The Debtor's demonization of a creditor is not well taken. It seems that NSM's objective is to demonize CMS, and to not actually take possession of the records. CMS is anxious to get rid of the records and to completely dissociate with Kohn.

34. On March 8, 2023 CMS's director of IT made contact with Mr. Forsstrom. Mr. Forsstrom can have the records, the sooner the better as far as CMS is concerned.

35. The turnover plan already started before the Debtor filed its turnover motion is as follows:

    A. <u>Bank Records</u>. Kohn and NSM has had access to the Bank account records for several months. In fact, Kohn has taken funds from the bank account without SMS's prior consent. Those funds were deposited by the residents' insurance companies and were earmarked for resident care. Kohn's taking control of funds in the bank account is another reason why CMS cannot and will not remain as manager.

B. <u>Financial Records</u>. Kohn and NSM shareholders have regularly received financial reports of NSM for years, including balance sheets, income statements and budgets.

C. <u>Payroll Records</u>. Payroll is handled by an outside vendor named Mosaic which maintains the records. Access to payroll records is provided through Mosaic's portal. Yesterday, March 9, Mosaic reached out to Mr. Forsstrom to give him access to the portal.

D. <u>Account Receivable Records</u>. Account Receivables are also handled by an outside vendor named MatrixCare, and records are a available through MatrixCare's portal. Yesterday, March 9, MatrixCare reached out to Forsstrom to give him access to the portal.

E. <u>Account Payable Records</u>. Account payable records are stored with a third party vendor named VCPI. VCPI will contact Forsstrom today.

F. <u>Paper Records</u>. Some paper records are at the NSM facility and NSM as taken possession of the facility and the records. Some paper records were kept at offsite storage, and those records will be delivered to the facility today.

36. The above described records constitute a large quantity of electronically stored data. Everyone should expect that typical technical issues will arise in the transfer of the data. CMS will work through those technical issues in a timely manner to complete the transfer of the records so Kohn, Forsstrom and NSM will have complete control and responsibility for all of NSM's and its residents' records.

DN 7509796.1

37. In connection with the turnover, CMS asks NSM to agree, and for the court to order that CMS can immediately remove its signage and logos from the building.

38. Finally, CMS is entitled to compensation for its post-petition work. Having failed to find a new management company, it appears that the Debtor continues to operate the facility under CMS's credentials. If CMS is forced to work against its will and accept risk under its credentials CMS must be compensated.

WHEREFORE, Columbine Management Services, Inc. submits its Preliminary Response To Motion To Compel Turnover Of Estate Property.

DATED March 10, 2023.

Respectfully submitted,

SPENCER FANE LLP

*/s/John O'Brien*
John O'Brien #15183
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
Phone: (303) 839-3800
Fax: (303) 839-3838
Email: jobrien@spencerfane.com

and

Zachary Fairlie #68057
Spencer Fane LLP
1000 Walnut, Suite 1400
Kansas City, MO 64106
Phone: (816) 292-8223
Fax: Fax: (816) 474-3216
Email: zfairlie@spencerfane.com
Attorneys for Columbine Management Services, Inc.

DN 7509796.1

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 10, 2023 I served via CM/ECF system an electronic copy of the Columbine Management Services, Inc. Preliminary Response To Motion To Compel Turnover Of Estate Property on all parties against whom relief is sought and those otherwise entitled to service pursuant to the Fed. R. Bankr. P. and the L.B.R. at the following addresses:

> Aaron Garber agarber@wgwc-law.com
> US Trustee USTPRegion19.DV.ECF@usdoj.gov
> Robert Samuel Boughner Samuel.boughner@usdoj.gov
> Jolie A. Lofstedt joli@jaltrustee.com

The undersigned further certifies that on March 10, 2023 a true and correct copy of the Columbine Management Services, Inc. Preliminary Response To Motion To Compel Turnover Of Estate Property was served to the following by first class, postage prepaid U.S. Mail:

North Shore Manor, Inc.
201 Columbine St., STE 15
PO Box 6362
Denver, CO 80206

Aaron A. Garber
Wadsworth Garber Warner Conrardy, P.C.
2580 West Main Street
Suite 200
Littleton, CO 80120

Robert Samuel Boughner
Byron G. Rogers Federal Building
1961 Stout St., Ste. 12-200
Denver, CO 80294

U.S. Trustee
Byron G. Rogers Federal Building
1961 Stout St., Ste. 12-200
Denver, CO 80294

Joli A. Lofstedt
Attn; Joli A Lofstedt Trustee
PO Box 270561
Louisville, CO 80027-5009

*/s/John O'Brien*
John O'Brien