# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: ) | |
| ) | Case No. 23-10809 JGR |
| NORTH SHORE MANOR, INC., ) | |
| ) | Chapter 11 |
| Debtor. ) | |

**STATUS REPORT AND ADVISEMENT OF REMAINING OUTSTANDING DISPUTES**

    North Shore Manor, Inc., debtor-in-possession herein ("Debtor"), by and through undersigned counsel, respectfully provides this Court with this *Status Report and Advisement of Remaining Outstanding Disputes* in advance of the hearing scheduled for Thursday, March 16, 2023 at 3:00 p.m. In support thereof, Debtor states as follows:

    1.    Debtor filed for relief under Chapter 11 of Title 11, Subchapter V, of the United States Code (the "Bankruptcy Code") on March 6, 2023 (the "Petition Date"), and is operating as a debtor-in-possession.

    2.    Debtor owns and operates a 120-bed skilled nursing facility in Loveland, Colorado (the "Facility"). There are approximately 103 residents at the Facility and 170 staff. The residents of the Facility require daily healthcare services.

    3.    On the Petition Date, the Debtor filed its Motion for Expedited Hearing (Docket No. 30) which is incorporated herein by reference and provides a detailed statement about the Debtor's position with respect to the events that led to this bankruptcy filing.

    4.    To provide context for this status report it needs to be reiterated that the Debtor is a party to a Management Agreement dated October 1, 2004 with Columbine Management Services, Inc. ("CMS"). The Management Agreement has neither been terminated nor rejected.[1]

---

[1] CMS remains obligated to perform under the Management Agreement. *See In re Whitcomb & Kelly Mortgage*, 715 F.2d 375 (7th Cir. 1983) (bankruptcy court did not err in issuing restraining order prohibiting creditor from discontinuing essential computer services to debtor in possession; *In re Continental Energy Assoc. Ltd.*, 178 B.R. 405 (Bankr. M.D. Pa. 1995) (Bankruptcy court can compel the non-debtor party to an executory contract to continue to perform postpetition, and can provide any safeguards for the non-debtor party. Although the cost of the services provided "will often times ... be measured by reference to the contract which presumably has been negotiated at arm's length," that is not required; the court may order payment of only the "reasonable value of the material or services supplied.").

5. CMS is a Colorado corporation owned by J. Robert Wilson ("Mr. Wilson"). Mr. Wilson is a 15% shareholder of North Shore Manor and has served as the President and CEO of the Debtor for nearly 30 years until November of 2022, when Mr. Wilson and the other shareholders of the Debtor appointed a new Board of Directors ("Board") by unanimous written consent. Mr. Wilson also served as the Managing Partner of North Shore Associates, the Debtor's landlord and affiliate until that time pursuant to a 2006 amendment to the North Shore Associates' partnership agreement which was terminated in November of 2022.

6. Notwithstanding appointment of a new Board, as of the Petition Date, Mr. Wilson and CMS retained complete operational control of the Facility, its employees, and its residents. At no point was the Board consulted regarding any operational or financial decision at the Facility. Indeed, the single directive provided by the Board to Mr. Wilson on March 20, 2023 to submit for approval any expenditure over $5,000 was completely disregarded by Mr. Wilson and CMS, who continued to issue checks in excess of that amount prior to the Petition Date.

7. Upon information and belief, prior to the Petition Date, Mr. Wilson caused CMS to hire vendors owned by Mr. Wilson or Mr. Wilson's family (or companies controlled by the same), which constitute the majority (between 80% and 90%) of the Facility's vendors (the "Vendors").

8. Mr. Wilson just prior to the Petition Date formed an entity called Wapello Holdings II, LLC ("Wapello") who purchased the alleged secured debt in this case.

9. John O'Brien of Spencer Fane is counsel for CMS, the Vendors, and Wapello. CMS, the Vendors, and Wapello may have conflicting interests in this case.

10. As a result of CMS's management of the Facility, Debtor has been placed in a precarious financial position which played a role in the bankruptcy filing.

11. Under the Management Agreement, CMS is obligated to manage all aspects of the operation of the Facility, "including, but not limited to staffing, accounting, billing, collections, setting of rates and charges and general administration." Management Agreement, Section 1.02.

12. Under the Management Agreement, CMS's duties include, without limitation, (a) hiring and maintaining all staffing and the Facility, including an administrator (the "Administrator"); (b) issuing and collecting the fees and costs charged to residents of the facility; (c) maintaining and repairing the Facility; (d) providing goods and services for the residents; (e) paying, to the extent money is available, the costs and expenses associated with the Facility; (f) maintaining all permits and licenses required to operate the Facility; (g) maintaining all insurance

in the name of the Debtor, CMS or such other persons requested by the Debtor; (h) maintaining the books and records of the Debtor and patient records; (i) obtaining loans on behalf of the Debtor.

13. CMS also has certain reporting obligations to the Debtor under the Management Agreement.

14. CMS asserted that it "will cooperate in a smooth transition for the welfare of the residents." *See Columbine Management Services, Inc.'s Preliminary Response to Motion to Compel Turnover of Estate Property*, ¶ 26.

15. Notwithstanding this statement, Wilson, CMS and the Vendors, through O'Brien, have taken action to make the transition extremely difficult, placing staffing at risk, the safety of residents at risk, which in turn places the Debtor's license at risk and thus a successful reorganization at risk.

16. O'Brien has refused to appoint at point of contact business person at CMS or the Vendors to assist with the transition. Instead O'Brien insists all correspondence go through undersign counsel and himself. Such is a inefficient means to address business issues. O'Brien also refuses to accept or return phone calls of undersigned counsel and will only communicate by email. This inefficiency has the direct effect of threatening the well-being of the Facility, its employees, and its residents.

17. The turnover of books and records of the Debtor has been inefficient.

    a. The Debtor has been requesting its books and records since the first week of March, 2023 (prepetition).

    b. Turnover of the books and records of the Debtor, the patient records of the Debtor, and the insurance policies relating to the Facility have not been provided in any logical, organized, or cooperative manner. Rather, large groups of documents have been just dumped on the Debtor all at the same time. Access to electronic information has been made difficult as CMS has not been provided notice of the transition of accounts or such notice has been delayed. By way of example, notwithstanding the fact that CMS is obligated to manage payroll under the Management Agreement, CMS has outsourced that role to a third party. Notwithstanding statements to the contrary, it was not until March 13, 2023 that O'Brien had the payroll company contact undersigned counsel (and not a business person of the Debtor). The contact at the payroll service informed undersigned counsel that he was forced to go through O'Brien because CMS was not getting back to

him about the transfer of the account. Payroll is due to be pushed on Monday, March 20, 2023. CMS has refused to push payroll for the benefit of employees having the direct effect of threatening the livelihood of those employees. The Debtor has budgeted for payroll and has sufficient funds to ensure payroll is paid in full but CMS has rendered issuing such payroll impossible.

        c.      Another example, though the Debtor reached out to the CMS accounting team on March 9, 2023, a response was not provided until March 14, 2023 and assistance with the transfer of the Debtor's electronic records will not take place until March 17, 2023. These records constitute the most important records to the Debtor, including easily accessible and sortable financial data in either Quickbooks or Quicken or some other usable form, from which the Debtor can begin to completes its schedules of assets and liabilities.

        d.      To the extent CMS and Mr. Wilson are providing information, records, data, and documents to Debtor, the same are being delivered in a haphazard and disorganized manner, which make it impossible for Debtor to synthesize and act on such information in a logical and timely fashion. CMS and Mr. Wilson have been managing the Facility for years and have dumped countless boxes of paper records without providing any explanation of their contents or any meaningful filing system that would enable the Debtor to review them in order of priority. Even were the Debtor able to access the raw data that O'Brien insists he has already provided through VCPI (which has not occurred due to delays from CMS), the Debtor does not know the form such data takes and whether such data is usable without hundreds of hours of review. Such review is made exponentially more difficult because CMS refuses to provide a business contact to assist with such a transition and to provide context to such data. Counsel for CMS and Mr. Wilson has informed Debtor that he will serve as the point of contact for the orderly transition of management of the Facility. This arrangement is unworkable because opposing counsel lacks the institutional knowledge and practical experience necessary to adequately coordinate an orderly transition. Debtor believes that employees and agents of CMS with knowledge and experience in the management of the Facility are best suited to assist with the transition.

18.      The Facility's current Administrator reports that since the Petition Date:

        a.      CMS has indicated it will soon cease transportation services to North Shore

Manor and its residents.

  b. CMS has ceased forwarding job applications to North Shore Manor unless such applications are specifically directed to North Shore Manor.

  c. CMS has accepted applications for transfer from North Shore employees.

  d. CMS has indicated that it will no longer provide human resources services to North Shore Manor's employees.

  e. CMS has ceased providing North Shore Manor employees with educational services used to obtain professional certifications.

  f. CMS has indicated that it will soon cease pharmacy services to North Shore Manor and its residents.

  g. CMS has indicated that North Shore may no longer admit residents who are on intravenous antibiotics because CMS does not want to incur the costs associated with obtaining the necessary medication for such residents.

  h. CMS has indicated that the residents of North Shore Manor may no longer use Columbine Medical Supply or Columbine Distribution Center (vendors owned or controlled by Mr. Wilson or his family members) to obtain necessary medical supplies or equipment.

  i. North Shore Manor relies on CMS for access to accounts under which office supplies, copiers, computer equipment, and internet are provided to the Facility.

  j. Although it retained control and access over North Shore Manor's financial accounts, CMS refused to pay the invoices of certain third-party vendors who supply mission critical services to the Facility. For instance, a staffing company that provides several certified nurse assistants to North Shore threatened to pull its employees from the Facility due to non-payment of invoices.

  k. CMS retains control over resident trust accounts and North Shore Manor is unable to pay beauticians and other vendors who provide valuable services to residents out of such trust accounts.

  l. CMS has not provided checks and other materials necessary to execute payments on behalf of North Shore Manor.

  m. CMS retains control over North Shore Manor's electronic medical records and accounting system which may prevent North Shore Manor from being able to adequate

manage patient care and billing.

19. CMS has alleged Debtor's employees were grouped with other non-Debtor vendor employees for purposes of health insurance and retirement benefits. CMS alleges Debtor's employees are no longer eligible for inclusion in such benefit plans, that recent events constitute a "termination event" under such plans, and that Debtor's employees need to be notified of the same. However, CMS has failed to explain what event triggered the alleged termination of benefit rights and has failed or refused to provide a copy of the benefit plan(s). Notice of termination of benefits was provided on March 14, 2023 with a termination date of the 15th.

20. On or about March 14, 2023, in order to prevent the termination of essential services to the Facility's residents, Debtor and the Vendors, who upon information and belief are owned or controlled by Mr. Wilson and his family members, entered into a Vendor Agreement. A true and accurate copy of the Vendor Agreement is attached hereto as **Exhibit 1**. Debtor acquiesced to the terms of the Vendor Agreement in response to demands from CMS and Mr. Wilson and the Vendor Agreement contains terms very favorable to the Vendors. Again approximately 48 hours notice of the coming termination was provided. The Debtor entered into such Vendor Agreement notwithstanding the fact that CMS is obligated under the Management Agreement to secure such vendors in order to ensure that CMS's failure to perform under the Management Agreement does not result in harm to the Facility's residents and employees.

21. O'Brien contacted the Department of Health on behalf of CMS and made statements about the financial security of the Facility which the Debtor disputes.

22. CMS has failed to pay critical invoices post-Petition Date while it remains obligated to pay such amounts under the Management Agreement and has retained access to the bank account.

23. The Debtor has identified a potential new management company who has stated it will take between 60 to 90 days to complete a transition, but to do so requires an orderly transition, which is not occurring.

24. Adding further unnecessary chaos, O'Brien is trying to add non-critical matters as a part of the discussion, including removal of CMS signs at the facility, but not providing critical detail (such as which signs, whether the removal requires electrical work and if so the state that the Facility will be left in, particularly whether the work will be performed so there is compliance with codes and whether holes will be left in walls and whether there are CMS signs that CMS

made a part of North Shore Manner signs and if so, how they remove just the CMS portion of the signs). Undersigned counsel has suggested that the business people coordinate the removal of the signs since this is not a legal issue, but such a request has been denied.

25. Mr. O'Brien is seeking to take the deposition of one of the shareholders and offices of the Debtor. Mr. O'Brien has stated that individual needs independent counsel. Yet, Mr. O'Brien refuses and/or has failed to identify which of his clients are seeking to take the deposition, what are the topics of the deposition and why the individual needs independent counsel for the deposition. Yet, Mr. O'Brien asserts the deposition is on account of a contested matter, so a Rule 2004 motion is not necessary. Yet the only contested matter is cash collateral.

26. For a reason unbeknownst to undersigned counsel, on March 15, 2023, CMS, through Spencer Fane, overnighted a check in the amount of $15,906.78 that are resident trust fund monies. The monies were held in a North Shore account, so it is uncertain why such funds were withdrawn. Nor was there any business purpose for sending the funds to undersigned counsel. Undersigned counsel requested that the funds not be sent to him, and to allow a short time for undersigned counsel to understand if the funds needed to be relocated and is so to where. Such request went ignored. There was no urgency to remove the resident trust monies from the existing account. These funds belong to the residents and there was no reason on less than 24 hours notice to move this money or to send it to undersigned counsel. The resident trust fund bank account is now overdrawn and the residents do not have access to their money. The money will just be returned to the Debtor to redeposit into its bank account.

27. Court intervention is needed to assure an orderly transition and to protect the safety of the residents.

28. CMS and the Vendors cannot be permitted to serve the goal of Wilson, which appears to be to put this Facility out of business and whatever other motives he has. This is more essential because Wilson, as a shareholder and Manager of the Facility, created a network that benefited him and his family by making the Facility dependent upon him and the Vendors.

29. Given Wilson elected to create such a network and a duty to perform remains operative under the Management Agreement, he must cooperate with the transition and do that which is necessary to ensure the continued operation of the Facility and the health and well-being of the residents. Lip service that he is cooperating is insufficient. Resident health is at stake and employee payroll and benefits are dependent upon cooperation.

WHEREFORE, the Debtor respectfully submits this Status Report and Advisement of Remaining Outstanding Disputes.

Dated: March 16, 2023.              Respectfully submitted,

*/s/ Aaron A. Garber*
Aaron A. Garber #36099
David J. Warner #38708
WADSWORTH GARBER WARNER CONRARDY, P.C.
2580 West Main Street, Suite 200
Littleton, Colorado 80120
Telephone: (303) 296-1999
Telecopy: (303) 296-7600
agarber@wgwc-law.com
dwarner@wgwc-law.com

**EXHIBIT 1**

# VENDOR AGREEMENT

This Vendor Agreement ("Agreement") is made and entered into as of March 14, 2023 by and between North Shore Manor, Inc, ("NSM") on the one hand and Centre Pharmacy Inc., Centre Elderly Transportation, Columbine Distribution Center LLC, Columbine Medical Equipment Inc., Front Range Therapy Systems and Poudre Infusion Therapy (each, a "Vendor" and collectively, the "Vendors") on the other hand (collectively, the "Parties").

## RECITALS

A.  NSM filed it voluntary petition for relief under SubChapter V of the Bankruptcy Code on March 6, 2023 and remains a Debtor-in-possession.

B.  The Vendors are critical vendors for NSM and have delivered goods and services on and after March 6, 2023 through March 13, 2023 in the total amount of $55,514.47 as itemized below for the welfare of the residents at NSM's skilled nursing facility (the "Post-Petition Obligations"):

| **NAME** | **Amount** |
|---|---|
| Centre Pharmacy Inc | $12,400.23 |
| Centre Elderly Transportation | $ 2,878.15 |
| Columbine Distribution Center LLC | $ 7,596.93 |
| Columbine Medical Equipment Inc | $ 2,372.62 |
| Front Range Therapy Systems | $27,183.46 |
| Poudre Infusion Therapy LLC | $ 3,083.08 |
| Total | $55,514.47 |

C.  The Vendors and a general description of the goods and services they provide are listed below. In a typical week the average historical weekly charge by the Vendors to NSM is approximately the amounts stated below (each, a "Retainer Payment" and collectively, the "Retainer Payments"):

| **VENDOR** | **GOOD/SERVICES** | **RETAINER PAYMENT** |
|---|---|---|
| Centre Pharmacy Inc. | pharmacy | $9,000.00 |
| Centre Elderly Transportation | resident transportation | $10,000.00 |
| Columbine Distribution Center LLC | non-medical supplies | $7,000.00 |
| Columbine Medical Equipment Inc. | medical supplies | $16,500.00 |
| Front Range Therapy Systems | therapy | $30,000.00 |
| Poudre Infusion Therapy LLC | infusion | $3,000.00 |

1

D. NSM has requested, and the Vendors have agreed to deliver goods and services to NSM in accordance with the terms and conditions stated below.

## AGREEMENT

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. <u>Payment Method</u>. All payments to the Vendors hereunder shall be made by wire transfer in accordance with the following wire transfer instructions:

| **VENDOR** | **ROUTING NUMBER** | **ACCOUNT NUMBER** |
|---|---|---|
| Centre Pharmacy Inc | 107000262 | 1862323 |
| Centre Elderly Transportation | 107000262 | 43032555 |
| Columbine Distribution Center LLC | 107000262 | 600101016 |
| Columbine Medical Equipment Inc | 107000262 | 1894288 |
| Front Range Therapy Systems Inc d/b/a Columbine Therapy Services | 107000262 | 1884119 |
| Poudre Infusion Therapy LLC | 107000262 | 600003053 |

**Bank Address for all**: First National Bank of Omaha
802 W Drake Rd Ste 101
Fort Collins, CO 80526

2. <u>Post-Petition Obligations</u>. On March 15, 2023 NSM shall pay the Post-Petition Obligations to Vendors.

3. <u>Future Deliveries</u>. Commencing on Wednesday, March 15, 2023 and continuing on each Wednesday thereafter until this Agreement terminates, NMS shall pay the Retainer Payments as a prepayment for goods and services for the following seven-day period (Thursday through Wednesday); provided however that the first payment due on Wednesday, March 15, 2023, shall cover the 8-day period of March 14, 2023 through March 22, 2023.

4. <u>Use of Retainer Payments</u>. The Vendors may use the Retainer Payments solely for COD payments for post-petition deliveries of goods and services. Any unused Retainer Payments shall be carried over to the next week for use the following week. The Vendors may increase the Retainer Payments amount in the event NSM orders, and the Vendors deliver goods and services in excess of the Retainer Payments.

5. <u>Termination</u>. NSM may terminate this Agreement upon 1-day notice. The Vendors may terminate this Agreement upon 7-days notice. Notwithstanding the foregoing the Vendors shall be under no obligation to deliver goods and services unless there are sufficient unused Retainer Payments to pay for such deliveries of goods and services, or unless NSM supplements

2

the Retainer Payments or makes COD arrangements with good funds satisfactory to the Vendors to cover future deliveries of goods and services.

6. <u>Governing Law; Jurisdiction</u>. The Parties agree that this Agreement shall be construed in accordance with Colorado law and consent to the exclusive jurisdiction of the U.S. Bankruptcy for the District of Colorado; provided, however, that in the event the U.S. Bankruptcy Court no longer has jurisdiction then jurisdiction shall lie in the Larimer County District court.

7. <u>Unopposed by Secured Lender</u>. Wapello Holdings II, LLC asserts the secured lien on NSM's accounts and has indicated that it consents to the terms of this Agreement. NSM reserves the right to investigate the validity of Wapello Holdings II, LLC's lien on NSM's accounts and assets.

NORTH SHORE MANOR, INC.

By: *[signature]* ROBERT D CHURCH Jr
Its: Interim CEO

CENTRE PHARMACY INC.

By: _____
    Eric Ellis
Its: Manager

CENTRE ELDERLY TRANSPORTATION

By: _____
    Brent Unrau
Its: Manager

COLUMBINE DISTRIBUTION CENTER LLC

By: _____
    Kevin McLeish
Its: Manager

COLUMBINE MEDICAL EQUIPMENT INC.

By: _____
    Ross Alexander
Its: Manager

3

CENTRE ELDERLY TRANSPORTATION

By: _____
      Brent Unrau
Its:  Manager

COLUMBINE DISTRIBUTION CENTER LLC

By: _____
      Kevin McLeish
Its:  Manager

COLUMBINE MEDICAL EQUIPMENT INC.

By: _____
      Ross Alexander
Its:  Manager

FRONT RANGE THERAPY SYSTEMS

By: _____
      Brad Harriss
Its:  Manager

POUDRE INFUSION THERAPY

By: _____
      Tanya Golonvanoff
Its:  Manager

4

the Retainer Payments or makes COD arrangements with good funds satisfactory to the Vendors to cover future deliveries of goods and services.

6. Governing Law; Jurisdiction. The Parties agree that this Agreement shall be construed in accordance with Colorado law and consent to the exclusive jurisdiction of the U.S. Bankruptcy for the District of Colorado; provided, however, that in the event the U.S. Bankruptcy Court no longer has jurisdiction then jurisdiction shall lie in the Larimer County District court.

7. Unopposed by Secured Lender. Wapello Holdings II, LLC asserts the secured lien on NSM's accounts and has indicated that it consents to the terms of this Agreement. NSM reserves the right to investigate the validity of Wapello Holdings II, LLC's lien on NSM's accounts and assets.

NORTH SHORE MANOR, INC.

By: _____

Its: _____

CENTRE PHARMACY INC.

By: *[signature]*
Eric Ellis
Its: Manager

CENTRE ELDERLY TRANSPORTATION

By: *[signature]*
Brent Unrau
Its: Manager

COLUMBINE DISTRIBUTION CENTER LLC

By: *[signature]*
Kevin McLeish
Its: Manager

COLUMBINE MEDICAL EQUIPMENT INC.

By: *[signature]*
Ross Alexander
Its: Manager

3

DN 7522905.6

FRONT RANGE THERAPY SYSTEMS

By: *Brad Harris* (signature)
Brad Harris
Its: Manager

POUDRE INFUSION THERAPY

By: (signature)
~~Tanya Golonvanoff~~ Joel Bitler
Its: Manager  COO

4