# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: | ) |
| | ) |
| NORTH SHORE MANOR, INC. | ) Case No. 23-10809-JGR |
| | ) |
| Debtor. | ) Chapter 11, Subchapter V |
| | ) |

## LIMITED OBJECTION TO MOTION FOR APPROVAL OF LENDING AND SECURITY AGREEMENT AND FOR AUTHORITY TO INCUR DEBT ON AN ADMINISTRATIVE AND SECURED BASIS

Columbine Management Services, Inc ("CMS"), Columbine Health Systems ("CHS"), Wapello Holdings LLC ("Wapello"), Wapello Holdings II, LLC ("Wapello II"), Centre Pharmacy, Inc ("Centre Pharmacy"), Columbine Distribution Center, LLC ("Columbine Distribution"), Columbine Medical Equipment, Inc ("Columbine Medical"), Poudre Infusion Therapy, LLC ("Poudre Infusion") and Bob Wilson, individually and as the duly elected and currently serving managing partner of North Shore Associates ("Bob Wilson") (collectively, the "Objectors") by and through its attorneys, John O'Brien of Spencer Fane LLP for its Limited Objection To Motion For Approval Of Lending And Security Agreement And For Authority To Incur Debt On An Administrative And Secured Basis states as follows:

I. SUMMARY OF POSITION

1. The Objectors' objection centers on NSA granting the Inside Lenders a lien on NSA's building and an administrative claim against the NSA estate. Otherwise, the Objectors are agreeable to the New Loan to NSM.

II. THE SUBSTANTIVE CONSEQUENCE OF THE RELIEF REQUESTED.

2. NSM is administratively insolvent. The substantive consequence of the relief requested in the proposed new loan (the "New Loan") is as follows:

      A.      NSA's building equity would be pledged for New Loan advances to NSM;

      B.      Certain insiders (the "Inside Lenders") will be paid 8% and 16% interest upon the New Loan default;

      C.      NSM proposes to use the New Loan advances to pay professionals;

      D.      It is impossible to repay the New Loan from NSM income or profits;

      E.      The end game will be NSA's equity in its building will be used to repay the New Loan and Inside Lenders;

      F.      NSA's equity in its building will be transferred to the Inside Lenders; and

      G.      Mr Wilson's 15% ownership in NSA's building (through his ownership in the NSA partnership) will be forfeited to pay: (1) NSM professionals with administrative claims; (2) the Inside Lenders with interest at 8% and later 16%.

3.      At its core, the purpose of, and only winners under the proposed New Loan would be NSM's professionals because NSM otherwise has no equity or positive cash flow to pay them.

4.      No budget was provided with the Motion as required by L.B.R. 4001-2. If a budget were provided it would show that NSM will continue to have negative cash flow, and that the New Loan will not be repaid from business operations. The New Loan will be repaid from the foreclosure or sale of NSA's building. In a nutshell, the motion proposes to use NSA's building equity to pay NSM's administrative expenses before NSM shuts down. There is no benefit to NSA. The only benefits inure to NSM's professionals and to the Inside Lenders who will earn 8% and eventually 16% on a real estate loan.[1]

---

[1] A budget was filed in connection with a cash collateral motion at Doc # 169-1. That budget does propose to use any of the New Loan advances to repay the Wapello II debt. The only budget filed wit the court is outdated and does not conform to the proposed in the New Loan events.

5. The losers under the New Loan would be: (1) Bob Wilson who is asked to forfeit 15% of his equity in NSA's building to repay the New Loan; (2) Centra Pharmacy, Columbine Distribution, Columbine Medical, Poudre Infusion and other administrative claimants to the extent New Loan advances are used to scoot NSM's professionals to the front of the administrative claim line; and (3) NSA partners who are not a part of the Insider Lender group.

6. Pledging NSA's building for this purpose is improper, and this aspect of the proposed New Loan should not be approved.

7. Likewise, granting the Inside Lenders an administrative claim in the NSA case is improper. Because NSA does not have an unsecured creditor pool the consequence would be that NSA will repay loan advances made to NSM.

8. No New Loan advances are going to NSA. NSA has not approved pledging its building or granting an administrative claim in accordance with its Partnership Agreement and governance requirements. Further, if NSA needs funds the proper method for NSA to raise funds is by a capital call under Section 4.2 of NSA's Partnership Agreement which authorizes capital calls on partners who signed the Partnership Agreement.

III. NEW LOAN TERMS ACCEPTABLE TO THE OBJECTORS.

9. NSM did not collaborate with the Objectors before filing the motion. This is unfortunate. The Objectors and their affiliates are at least 80% of the creditor pool, the only secured creditors, and Bob Wilson owns 27% of the voting rights and 15% of the equity in NSA and 15% of the equity in NSM. Moreover, when the concept of a New Loan was raised the Objectors informed the court that pledging NSA's building to secure a New Loan would be problematic. In response Debtor's counsel stated that the building pledge would be eliminated if the court so ordered. The New Loan motion proposes to pledge NSA's building and invites this Objection.

10. The Objectors' objection is limited. The Objectors do not resist the Inside Lenders making the New Loan to repay Wapello II's loan and using the remainder of the New Loan advances for NSM's working capital needs.

11. The Objectors also consent to the Inside Lender's interest rate of 8% and 16% upon default. The New Loan is designed to go into default, and as a practical matter the interest rate on the New Loan will soon be 16%. By comparison, the Wapello II's default interest rate is 9.25%, and Bob Wilson made loans to NSM to cover payroll at 0% interest.

12. It should be noted that NSM's motion states that Wapello II's loan will be paid in full, but uses Wapello II's petition day payoff of $393,528.44. It is uncontested that Wapello II is fully secured and is entitled to post-petition interest and reimbursables under 11 U.S.C. Section 506(b). Wapello II's loan currently bears interest at the default rate of 9.25%, and the per diem is $101.03. In addition, Wapello II's loan documents contain customary attorney fees clauses (as do the Insider Lender's proposed loan documents). Wapello II's reimbursable attorney fees total $32,800.04 for the period through April 30, 2023. As a result, the payoff on Wapello II's loan on the May 18, 2023 hearing date will be $432,683.07 plus reimbursables on and after May 1, 2023 plus interest on and after May 19, 2023 at the per diem rate of $101.03.

13. It should also be noted that the New Loan line of credit revolves "only with the express written consent of Lender." <u>See</u> Doc 95-1, at Paragraph 8. The Inside Lenders have reserved the right to make a one-time advance, declare a default without revolving further advances, then foreclose NSA's building. It is not hard to figure out that the purpose of the New Loan is to take advance of Bob Wilson and foreclose his 15% share of the equity in NSA's building. Indeed, the purpose of these bankruptcy filings have always been to take advantage of Bob Wilson.

IV. <u>NSA'S BUILDING CANNOT BE LAWFULLY PLEDGED AND SHOULD NOT BE PLEDGED TO SECURE THE NEW LOAN</u>.

14. NSA proposes to pledge NSA's building to secure the New Loan even though NSA does not need New Loan advances, and no New Loan advances will be made to NSA.

15. NSA and NSA are separate companies, and are separate debtors. If NSM cannot sustain its own operations and receive and repay the New Loan on its own merits then the New Loan should not be made to the detriment of NSA and its partners. Indeed, NSM's counsel acknowledged that the New Loan would not involve NSA's building if the court did not approve.

16. NSA is not a proper movant under 11 U.S.C. Section 364. 11 U.S.C. Section 364 does not apply to what NSA seeks to do here, namely use NSA's equity in NSA's building to repay a loan from an insider to a non-debtor entity (i.e. NSM).

17. There are several legal impediments to pledging NSA's building for a New Loan to a different debtor, NSM. Those impediments are outlined below.

A. <u>NSA's Motion Does Not Comply With 11 U.S.C. Section 364 Or L.B.R. 4001-2</u>

18. NSA is designated as a Single Asset Real Estate Case. It has no business operations. NSA owns a building which it leases to a non-debtor (NSM) under a triple net lease. NSA does not need, and does not meet the criteria for obtaining credit under Section 364. It has presented no budget as required by L.B.R. 4001-2 and has not complied with the requirements of L.B.R. 4001-2.

19. NSM and NSA's cases are neither jointly administered or substantively consolidated. There are two debtors. NSA and NSM are non-debtors with respect to each other.

20. In a nutshell, NSA seeks to give away equity in NSA's building for the benefit of certain insiders who propose to use NSA's building to secure a loan to a non-debtor (NSM). This is not a proper use of Section 364.

B. <u>The New Loan And Motion Are Not Authorized Under NSA's Partnership Agreement</u>.

21. NSA was formed on March 1, 1974 as a general partnership pursuant to a signed partnership agreement which was amended once on October 1, 2006 (the "Partnership Agreement").

22. NSA was never designed to be, and never was an operating business. It simply collected rent, and paid distributions to owners. NSA had a real estate mortgage, but never a line of credit and never needed to incur trade debt.[2]

23. In 1974 NSA started with seven partners who are deceased. On October 1, 2006 the Partnership Agreement was amended and signed by nine partners (some of whom were Original Partners, and some of whom were new, like Bob Wilson). Only three of those nine are still alive. The October 1, 2006 amendment appointed Bob Wilson as managing partner. The October 1, 2006 amendment further stated that the managing partner (Bob Wilson) is the sole decision maker on matters affecting title to NSA's assets unless "revoked by written decree of three fourth majority of the partners."

24. Likewise, Section 2.3 of the Partnership Agreement requires a "3/4's majority interest" of the partners to vote to "sell, encumber or otherwise dispose of Partnership real property." NSA's motion is properly before the court only if 75% of the interests of voting partners approve the mortgage after conducting an open partnership meeting required by the Partnership Agreement.

25. Section 2.5 of the Partnership Agreement requires that "The Partnership shall hold meetings from time to time as agreed to by the partners for the purpose of carrying out its functions

---

[2] During Covid NSM ran out of cash and NSA took out a bridge loan from BOK to fund NSM's operations which was promptly repaid by NSM when NSM received expected CoVid entitlements. NSA proposes something entirely different here. Here, the proposed New Loan cannot be repaid in any feasible manner without taking NSA's equity in the NSA building.

. . . ." Under this provision the Partnership Agreement requires open meetings of all partners (and not secret meetings of some partners) for NSA to conduct business not delegated to the managing partner.

26. There was no open meeting of NSA partners to authorize the filing of the bankruptcy petition. And the bankruptcy filing is ultra virus for failure to muster the 75% vote needed. In this regard, a Motion to Dismiss the NSA case is pending.

27. Likewise, there was no open meeting of NSA partners to authorize the filing of the "Joint Motion" to put a lien on NSA's building to secure the New Loan. Further, Bob Wilson was not notified of, did not agree to hold, and was not a participant in any partners' meeting required by Section 2.5 to authorize mortgage on NSA's building. Bob Wilson was not notified or and did not vote in favor of the shenanigans in this case.

28. Moreover, if a proper open partnership meeting was called, scheduled, and occurred, then the Bankruptcy Petition, the proposed mortgage of NSA's building and the removal of Bob Wilson as managing partner could not pass the required $3/4^{th}$ voting threshold without Bob Wilson's affirmative vote because Bob Wilson holds 27% of the voting rights in the NSA partnership. Bob Wilson was not invited to, and did not attend any partnership meeting to discuss any of this, and did not vote in favor of any of this.

29. Bob Wilson's vote is needed to approve a mortgage on NSA's building. Bob Wilson was not invited to vote, and did not vote in favor of a mortgage.

30. As described in the Motion to Dismiss, upon the death of a partner, that partner's heirs had to do certain things within 90 days of death to be admitted into the Partnership. See Partnership Agreement Section 6.4. ("Upon the death of any Partner . . . the personal representative . . . shall have 90 days to elect to continue in the Partnership [and if the]

representative elects to continue in the Partnership, he shall (i) <u>execute copy of this [partnership] agreement</u> . . . and (iii) agree to pay all Partnership obligations applicable to the deceased Partner's interest . . . .) [Emphasis added].

31. Here, only three of the nine New Partners admitted to the NSA partnership still survive. The rest inherited their partnership interests. Deceased Partner heirs never signed the Partnership Agreement, were never admitted to the NSA partnership, and never agreed to make capital calls in accordance with Section 4.2 of the Partnership Agreement. As a result, the heirs inherited only the deceased partner's economic interest in the partnership, but no management rights and no right to vote. <u>See</u> C.R.S section 7-60-127(1) ("A conveyance by a partner of the partner's interest in the partnership does not . . . entitle the assignee, during the continuation of the partnership, to interfere in the management or administration of the partnership business or affairs; but it merely entitles the assignee to receive . . . profits to which the assigning partner would otherwise ne entitled."). <u>See also</u> C.R.S. Section 7-60-118(g) ("no person can become a member of a partnership without the consent of all other partners.")

32. This common sense outcome also applies to law firm partnerships. The heirs of a deceased law partner inherit the deceased partner's capital and income accounts. But the deceased law partner's heirs cannot show up at partnership meetings and vote on the affairs of the partnership, such as the admission of new partners or the sale or hypothecation of partnership property.

33. Only three partners who signed the Partnership Agreement are still alive or exist. They are: Mark Kohn (30%); Beth Radetsky (11.25%) and Bob Wilson (15%). The heirs inherited 43.5% of the outstanding partnership interests. None of the heirs holding 43.5% signed the Partnership Agreement within 90 days of their inheritance, none were admitted to the

partnership, and none have voting rights. Bob Wilson holds 27% of the voting rights in the NSA Partnership. (15% divided by 56.25% equals 27%).

34. Thus, not only was no partnership meeting properly called to: (1) remove Bob Wilson as managing partner; (2) to authorize the filing of a bankruptcy petition; and (3) to pledge mortgage NSA's building to secure the New Loan, but also such resolutions could not pass without Bob Wilson's vote, and he opposes all three.[3]

35. In the NSA case, non-voting partners have attempted to hijack NSA's governance pursuant to a plan to pin and consolidate losses on a single creditor, Bob Wilson and his affiliates. However, such shenanigans are not permitted by the Partnership Agreement.

36. The Bankruptcy Code gives debtors rights relative to their creditors. But the Bankruptcy Code does not authorize minority non-voting equity holders to hijack a business for their own devious purposes. Moreover, NSA does not need bankruptcy protection. Here, certain non-voting equity holders seek to misuse the Bankruptcy Code, not because a business needs creditor relief; but rather because they want to take control of the business contrary to the entity's governance document. NSA's bankruptcy filing is unnecessary and is not a good faith filing.

37. Ignoring the debtor's governance requirements in this case encourages disregarding governance requirements in all cases. Imagine the chaotic result if persons without voting rights are rewarded in governance disputes by filing ultra virus bankruptcy petitions.

C. <u>Putting A Mortgage On The NSA Building Is Not Necessary And Is Not In The Best Interest Of NSA</u>.

---

[3] Section 4.2 of the Partnership Agreement created a mechanism for NSA to raise money if NSA needs money. Section 4.2 of the Partnership Agreement captioned "Additional Capital Contributions" divides the partnership's indebtedness into two categories: (1) The first category consists of "principal, interest and real estate tax obligations of the Partnership; and (2) the second category consists of all other partnership obligations. With respect to the first category, capital contributions are mandatory for Partners who signed the Partnership Agreement. The BOK mortgage loan now held by Wapello falls in the first category. As described in the Motion to Dismiss, three partners who signed the Partnership Agreement and who are still alive and are on the hook to pay pro rata mandatory category one capital calls. The other 43.75% who did not sign the Partnership Agreement and who did not agree to make capital calls might be the smart ones because they get a pass on this recapitalization obligation.

38. The Partnership Agreement has a provision for capital calls if NSA needs capital. See Partnership Agreement Section 4.2. The Partnership Agreement does not contemplate using NSA's assets to guaranty or secure a third party's loan.

39. Moreover, there is no evidence or expectation that the New Loan will be repaid from NSM's operations. The proposed New Loan simply transfers equity in NSA's building to the Insider Lenders who will eventually take NSA's building for payment of a 16% interest loan.

40. There is no legitimate business purpose for giving up equity in NSA's building to the Insider Lenders, any such proposal is inconsistent with partners' fiduciary duties to each other.

## V. NEW LOAN ADVANCES SHOULD NOT GIVE PROFESSIONALS PREFERENCE OVER OTHER ADMINISTRATIVE CLAIMS

41. NSM recognizes that it is administratively insolvent and needs New Loan Advances to pay administrative claims of NSM's professionals. But NSM's professionals are not the only creditors entitled to administrative priority. Centre Pharmacy, Columbine Distribution, Columbine Medical, Poudre Infusion, NSA (for unpaid post-petition rent) and the SubChapter V trustee also have administrative claims. The court denied NSM's professionals' efforts to jump to the head of the administrative claim line for early payments. See Doc # 140. Likewise, any New Loan Advances to pay administrative claims should not be dedicated solely to pay professionals. Administrative claims should be paid in accordance with their lawful priority, and pro-rata when insufficient money is available to pay them all. In short, the New Loan should not vacate the court's ruling at Doc #140.

## VI. CONCLUSION

42. The New Loan cannot be, and should not be secured by NSA's building, and the NSA case should be dismissed. The Inside Lenders should not get an administrative claim in the NSA case. Other than improperly involving NSA in a loan to NSM, the Objectors do not object

to the New Loan, including the payment of Wapello II's loan in the amount of $432,683.07 plus ongoing interest.

WHEREFORE, Columbine Management Services, Inc, Columbine Health Systems, Wapello Holdings LLC, Wapello Holdings II, LLC, Centre Pharmacy, Inc., Columbine Distribution Center, LLC, Columbine Medical Equipment, Inc., Poudre Infusion Therapy, LLC and Bob Wilson, individually and as the duly elected and currently serving managing partner of North Shore Associates submits their Limited Objection To Motion For Approval Of Lending And Security Agreement And For Authority To Incur Debt On An Administrative And Secured Basis. DATED May 15, 2023.

Respectfully submitted,

SPENCER FANE LLP

*/s/John O'Brien*
John O'Brien  #15183
Scott C. Sandberg #33566
Zachary Fairlie #68057
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
Phone: (303) 839-3800
Fax: (303) 839-3838
Email:  jobrien@spencerfane.com;
ssandberg@spencerfane.com;
zfairlie@spencerfane.com

Attorneys for Columbine Management Services, Inc, Columbine Health Systems, Wapello Holdings LLC, Wapello Holdings II, LLC, Centre Pharmacy, Inc., Columbine Distribution Center, LLC, Columbine Medical Equipment, Inc., Poudre Infusion Therapy, LLC and Bob Wilson, individually and as the duly elected and currently serving managing partner of North Shore Associates (collectively, the "Objectors")

**CERTIFICATE OF SERVICE**

The undersigned certifies that on May 15, 2023 I served via CM/ECF system an electronic copy of the Limited Objection To Motion For Approval Of Lending And Security Agreement And For Authority To Incur Debt On An Administrative And Secured Basis on all parties against whom relief is sought and those otherwise entitled to service pursuant to the Fed. R. Bankr. P. and the L.B.R. at the following addresses:

> Aaron Garber agarber@wgwc-law.com
> US Trustee USTPRegion19.DV.ECF@usdoj.gov
> Robert Samuel Boughner Samuel.boughner@usdoj.gov
> Jolie A. Lofstedt joli@jaltrustee.com

The undersigned further certifies that on May 15, 2023 a true and correct copy of the Limited Objection To Motion For Approval Of Lending And Security Agreement And For Authority To Incur Debt On An Administrative And Secured Basis was served to the following by first class, postage prepaid U.S. Mail:

North Shore Manor, Inc.
201 Columbine St., STE 15
PO Box 6362
Denver, CO 80206

Aaron A. Garber
Wadsworth Garber Warner Conrardy, P.C.
2580 West Main Street
Suite 200
Littleton, CO 80120

Robert Samuel Boughner
Byron G. Rogers Federal Building
1961 Stout St., Ste. 12-200
Denver, CO 80294

U.S. Trustee
Byron G. Rogers Federal Building
1961 Stout St., Ste. 12-200
Denver, CO 80294

Joli A. Lofstedt
Joli A Lofstedt, Trustee
PO Box 270561
Louisville, CO 80027-5009

Jo Tansey
State of Colorado Department of Health
Branch Chief Acute and Nursing Facilities
4300 Cherry Creek Drive South
Denver, CO 80246

Kay Blackman
Licensing and Certification Specialist
Colorado Department of Public Health and Environment
4300 Cherry Creek Drive South
Denver, CO 80246

Shelley Sanderman, JD
Enforcement Services Program Manager
Health Facilities and Emergency Medical Services
4300 Cherry Creek Drive South
Denver, CO 80246-1530

Leah McMahon
State Long-Term Care Ombudsman

Colorado State Long-Term Care Ombudsman Program
c/o Disability Law Colorado
455 Sherman Street, Suite 130
Denver CO 80203

                                                    */s/John O'Brien*
                                                    John O'Brien

DN 7812199.1