UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Case No. 23-10809-JGR |
| NORTH SHORE MANOR, INC., | ) |
| | ) Chapter 11 |
| Debtor. | ) |

**OBJECTION TO MOTION TO APPOINT CHAPTER 11 TRUSTEE**

North Shore Manor, Inc. (the "Debtor" or "NSM"), debtor-in-possession herein, by and through its undersigned counsel, for its Objection to Motion to Appoint Chapter 11 Trustee (the "Shut Down Motion") respectfully states as follows:

**BACKGROUND**

*The Debtor and The Bankruptcy Case*

1. The Debtor filed its Voluntary Petition for relief under chapter 11 of title 11 of the United States Code on March 6, 2023 (the "Petition Date"), and is operating as a debtor-in-possession.

2. The Debtor is a skilled nursing facility located in Loveland, Colorado (the "Facility").

3. The Facility is a 120-bed skilled nursing facility using the trade name North Shore Health & Rehab. The Facility accepts Medicare, Medicaid, and private pay residents offering a full-spectrum of clinical care including a sub-acute rehabilitation care unit and a dedicated hospice care unit.

4. On the Petition Date, the Debtor was a party to a Management Agreement dated October 1, 2004 with Columbine Management Services, Inc. ("CMS"). CMS is owned by J. Robert Wilson ("Wilson").

5. The Management Agreement with CMS was rejected effective April 14, 2023. NSM has engaged a new management company, QP Health Care Services, LLC d/b/a Vivage Senior Living ("Vivage") to assist in its operations.

6. On March 22, 2023, the U.S. Trustee appointed Leah McMahon as the health care ombudsman (the "Ombudsman").

7. On April 28, 2023, the Debtor filed its Motion to Approve Borrowing in the amount

of $700,000 (the "DIP Loan"). If the Court authorizes the DIP Loan, the Debtor will use a portion of the proceeds to pay off the claim of Wapello Holdings II, LLC. The balance of the proceeds will be used to pay administrative expenses of the estate.

*Disputed Facts*

8. The Shut Down Motion seeks to appoint a Chapter 11 trustee, shutter the facility and relocate its residents (see Shut Down Motion ¶ 71).

9. In support of the relief requested, Wapello Holdings II, LLC ("WH") and Columbine Management Services, LLC ("CMS;' and together, the "Movants") Movants make a number of factual allegations which are disputed by the Debtor. Many of the factual allegations are discussed below.[1]

10. Shut Down Motion, ¶ 6: Without recapitalization pre-Petition Date, the Debtor was headed to closure.

> Debtor response: This a conclusory statement made multiple times by the Movants without any evidentiary support. As detailed below, since the Debtor's separation from CMS the Debtor is experiencing financial success.

11. Shut Down Motion, ¶¶ 8-9: The Debtor is not financially viable, even with the $700,000 proposed lending.

> Debtor response: As of May 13, 2023, the Debtor has $917,618.39 in its bank account, is paying its debts as they come due and employee obligations current. In addition, the Debtor has approximately $1,200,000 in receivables (though not all of it may be collectable). The DIP Loan will only bolster the Debtor's financial condition. Further the satisfaction of WH's claim will hopefully reduce litigation in this case. Also, the Debtor will have a "friendly" secured creditor, given the new lender is comprised of insiders of the Debtor.

12. Shut Down Motion ¶ 10: The Debtor's March monthly operating report shows the Debtor is failing.

> Debtor response: March was the first month of this case. The Debtor was beginning its transition from CMS to a new management company. The management agreement with CMS remained in place during March. In addition, the Debtor was

---

1 To the extent the Debtor does not respond to a particular paragraph or a statement in a paragraph, such is not an admission that the statement is true, correct, and/or accurate.

in the process of trying to obtain its books and records from CMS. As explained, the Debtor has completed the transition to the new management company, Vivage. The Debtor's operations show, since moving from CMS in April, it is operating successfully - as of May 13, 2023, the Debtor has approximately $917,618.39 in its bank account, is paying bills and employees current. In addition, the Debtor has approximately $1,200,000 in receivables. Plus, the Debtor will have, upon Bankruptcy Court approval, the DIP Loan.

13. Shut Down Motion ¶ 11: The Debtor's census will cause the Debtor to fail.

Debtor response: On May 5, 2023 the census was 94, and had been for several weeks. On May 13, 2023, the census was 92. Although the Debtor's census has fluctuated since the Petition Date (fluctuating between 101 and 87), the Debtor's return to a consistent census has demonstrated its ability to onboard new residents. The Debtor has several sources for residents and its in-house admissions team has been working tirelessly to rebuild the resident referral sources. The current census demonstrates that such efforts have been successful.

14. Shut Down Motion ¶ 12: The Debtor cannot pay its operational expenses and administrative claims. Specifically, WH has as administrative priority claim for its cash collateral if there is a diminished cash collateral position, which will be the full amount it is loan. The census numbers are down. There are unnecessary professionals.

Debtor response: Proceeds from the DIP Loan will be used to satisfy the allowed claim of WH t, so this issue is moot. Further, the DIP Loan will provide money to pay administrative expense claims. Further, under the Debtor's cash and receivable position, WH's cash collateral position is not diminishing, it is in fact increasing. Further, the census numbers since the Petition Date are down slightly, but they are not impacting cash follow. There is a direct correlation between expenses and the number of residents. If the census is down, so are expenses, if the census is up, so are expenses. The Debtor has an in-house admissions team that has been working tirelessly to build and maintain several sources for resident referrals. Because Vivage is already enmeshed in the Loveland skilled nursing space, Vivage will also become a new source of residents for the Facility. Lastly, there are no unnecessary professionals. The Motion does not specify who is unnecessary. There is

bankruptcy counsel and an accountant. The Debtor's insiders understand that an obligation to confirm a Plan is to pay administrative claims on the effective date of the Plan.

15. Shut Down Motion ¶ 13: The Debtor owes rent.

Debtor response: The Debtor and the landlord, North Shore Associates ("NSA"), are owned by the same persons. NSA has one creditor, its secured creditor. There is a lease between NSA and the Debtor, which was signed by Mr. Wilson for both parties. The Debtor and NSA are evaluating whether the lease is fair market value and if it needs to be renegotiated.

16. Shut Down Motion ¶ 14: The vendor administrative claims will sink the Debtor's case.

Debtor response: The Debtor incorporates herein its Objection to the Application to Administrative Expense Claims (Docket No. 167). It should also be noted that a reclamation claim is a right to goods not money. As noted therein, the vendor administrative claims are grossly inaccurate and deeply contested.

17. Shut Down Motion ¶ 15: The creditors have repeatedly warned the residents at the Facility will need to be moved and it will result in an administrative claim.

Debtor response: There simply is no evidence this allegation is accurate. Although it is accurate that creditors (*i.e.* Mr. Wilson) have warned this Court that the residents of the Facility will need to be moved, there is no basis for such a warning. No party that would ordinarily effectuate such an event has raised any alarms, including applicable agencies with the State of Colorado or the Ombudsman. The Debtor continues to serve its residents as it has for more than 50 years. The Debtor has retained a well-respected management company with a strong presence in the region and with the resources and know-how to assist with the success of the Debtor's operations. The Debtor has satisfied every obligation called upon it to perform and has over the obstacle presented by the Wilson creditors. There is no reason to consider the possibility that the residents of the Facility will need to be moved, given the financial health of the Debtor and the harm such a transition will cause to the residents. The Debtor's financial situation is stable and there are no operational issues. It should be noted that even in a shut down scenario, there will

be residents at the Facility until the Facility is shuttered. That is, an orderly resident transfer will not cost nearly the amount proposed by Mr. Wilson. The Debtor's only fixed costs are rent, taxes, and utilities. In the event of a closure, the residents will continue to pay to remain in the Facility and for the treatment they receive until they are relocated and, as the residents are relocated, expenses will be proportionally reduced.. Staffing needs, medical needs, food needs and the like will be reduced as the census reduces.

18. Shut Down Motion ¶ 16: Administrative expense claims are too high.

    Debtor response: The Debtor has sufficient cash, receivables and the DIP to meet its administrative expense obligations.

19. Movant statement ¶ 17: The budget does not include payments to the SubV-Trustee

    Debtor response: The Debtor and its insiders understand the SubV-Trustee needs to be paid. Further there is a line item in the budget for Legal/Other Bankruptcy which includes the Sub-V Trustee.

20. Shut Down Motion ¶ 18: The Debtor is still holding $80,000 owed to employees.

    Debtor response: The Debtor is meeting employee obligations as they come due. If something is owed to employees it will be paid.

21. Shut Down Motion ¶ 19: The Debtor has not budgeted for the Provider Fee.

    Debtor response: To the extent this is owed it will be paid. The Debtor has sufficient cash. Upon the payment of WH, the Debtor will be working with a friendly secured creditor, so any necessary payment for the Provider Fee will be authorized.

22. Shut Down Motion ¶ 20: The Debtor has not properly budgeted of insurance.

    Debtor response: The Debtor disputes this allegation. If true, the Debtor has sufficient cash to pay insurance and has budgeted accordingly. The Debtor has all necessary insurance in place.

23. Shut Down Motion ¶ 22: The Debtor manipulated its March Monthly Operating Report.

    Debtor response: The Debtor's March Monthly Operating Report was prepared by its accountant, a certified public accountant. In addition to this credential, the accountant specializes in bankruptcy and health care cases. The reduction of

employees has no impact upon the Debtor or its operations. The Debtor is not replacing unnecessary employees and either has or is in the process of replacing any necessary workers. As of May 12, 2023 the Debtor has 151 employees. CMS, during this case, has plead that it cannot provide management services because it cannot access the Facility. It now asserts that it is entitled to the full amount of its management fee. Neither the facts nor the law support such an assertion. *In re Continental Energy Assoc. Ltd.*, 178 B.R. 405 (Bankr. M.D. Pa. 1995) (Although the cost of the services provided "will often times ... be measured by reference to the contract which presumably has been negotiated at arm's length," that is not required; the court may order payment of only the "reasonable value of the material or services supplied."). Much of paragraph 22 is a repeat of prior arguments.

24. Shut Down Motion ¶¶ 24-29: The Debtor did not timely retain manager.

Debtor response: This statement is inaccurate. The Debtor refers the Court to Docket Nos. 146 and 171.

25. Shut Down Motion ¶¶ 30-32. The Debtor does not have worker's compensation insurance.

Debtor response: The Debtor has worker's compensation insurance. Any delay was caused by CMS' broker not providing a waiver of the state mandated waiting period for the transition from the prior policy to the current policy.

26. Shut Down Motion ¶ 34: The Debtor has struggled filing state reports.

Debtor response: False. All reports are current. Any issues in preparing the reports arose from CMS' obstacles in proving necessary information to the Debtor.

27. Shut Down Motion ¶ 35: The Debtor accused CMS of taking $180,000.

Debtor response: False. In March of 2023, CMS handled the ACH for direct payment patients. In April, when the CMS management agreement was still in place (so this obligation would have belonged to CMS) CMS failed to initiate the ACH for direct payment patients. In fact, the Debtor was informed by the exiting administrator (who upon information and belief now works for a Wilson entity) that CMS initiated the ACH for direct pay patients. However, the Debtor had no way of knowing in the immediate that CMS failed to initiate the April ACHs. The Debtor could not charge the direct pay patients immediately or there was a risk the residents would be double billed if CMS had already

initiated the ACH. Undersigned counsel sent several emails to Mr. Obrien inquiring (not accusing) about the April ACH for direct pay residents. Neither undersigned counsel nor the Debtor were ever informed that CMS failed to initiate the ACH. When enough time passed that the Debtor was certain that the ACH did not occur, the Debtor handled the payments from the direct pay patients. The Debtor wanted to be sure these patients were not double billed.

28. Shut Down Motion ¶ 36: The Debtor and Mr. Church had admitted to substantial budgeting errors and submitted an amended budget.

> Debtor response: There was no such admission by the Debtor or Mr. Church. It is not uncommon for the initial cash collateral budget to be modified after the first day cash collateral motion is filed. In this case, on the Petition Date CMS had the Debtor's books and records. The transfer of the books and records was not a seamless process. It is unknown at this time if CMS has provided the Debtor with full access to its books and records. Further, there is new insurance, new vendors and a new management company.

## OBJECTION

29. The movants seek relief under Bankruptcy Code § 1104(a)(1) and (2). Each is addressed separately below.

*Applicable Law*

30. The appointment of a Chapter 11 trustee is an extraordinary remedy. *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, et al.*, 330 F.3d 548, 577 (3d Cir.2003); *In re Celeritas Techs., LLC*, 446 B.R. 514, 518 (Bankr. D. Kan. 2011).

31. "There is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990) (citations omitted). *Prologo v. Flagstar Bank, FSB*, 471 B.R. 115, 124 (Bankr. D. Md. 2012). See also *Official Cmte. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3d Cir. 2003); *In re Berwick Black Cattle Co.*, 400 B.R. 907, 912 (Bankr. C.D. Ill. 2009); *Tradex Corp. v. Morse*, 339 B.R. 823, 826 (Bankr. D. Mass. 2006).

32. Because a successful reorganization is advantageous to all parties in interest, there

is a strong presumption in Chapter 11 cases against appointment of a trustee and in favor of allowing the debtor-in-possession, who is most knowledgeable about and best able to run debtor's business, to remain in control while in bankruptcy. *In re Sundale Ltd.*, 400 B.R. 890, 899 (Bankr. S.D. Fla. 2009).

33. Further, where a movant cannot demonstrate that rehabilitation and reorganization are more likely under the auspices of a trustee than under the direction of present management, the expense and inconvenience of a trustee weighs against appointment. *In re Tyler*, 18 B.R. 574, 578 (Bankr. S.D. Fla. 1982); see also *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D.W. Va. 1980).

34. The burden of proof falls on the movant. Courts are split on the burden placed upon the movant. The majority of courts have adopted the higher burden of clear and convincing evidence is required for the appointment of a trustee. *In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 173 (Bankr. D. Colo. 1990); *see also In re G-I Holdings, Inc.*, 385 F.3d 313, 318 (3d Cir. 2004) ("The party moving for appointment of a trustee ... must prove the need for a trustee under either subsection by clear and convincing evidence."); *In re BG Petroleum, LLC,* 525 B.R. 260, 279 (Bankr. W.D. Pa. 2015) (whether on "for cause" theory or in the interests of creditors, moving party must show need for trustee by clear and convincing evidence). *In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 173 (Bankr. D. Colo. 1990); *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998); *In re Mako, Inc.*, 102 B.R. 809, 811-12 (Bankr. E.D. Okla. 1988). The minority of courts, including this Court in the Peak Serum case, have adopted the preponderance of evidence standard.

35. Bankruptcy Courts are courts of equity. *Pepper v. Litton*, 308 U.S. 295, 304 (1939); *In re Bonded Mailings, Inc.*, 20 B.R.781, 786 (Bankr. E.D.N.Y. 1982). "In determining whether the appointment of a trustee is in the best interest of creditors, a bankruptcy court must necessarily resort to its broad equity powers." *In re Hotel Associates*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980). One who seeks an equitable remedy must come to the court with clean hands. *In re Delfino*, 351 B.R. 786, 789 (Bankr. S.D. Fla. 2006); *In re Grimes*, 147 B.R. 307, 316 (E.D.N.Y. 1992). "[U]nclean hands may be employed by a court to deny … relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to a matter at issue to the detriment of the other party." *In re Mabone*, 471 B.R. 534, 538-39 (Bankr. E.D. Mich. 2012).

36. Ultimately, the decision to appoint a trustee is fact intensive and must be made on a case-by-case basis. *Plaza de Retiro, Inc.*, 417 B.R. at 640 (citation omitted). "The Court's task is to determine whether the totality of the circumstances warrant appointment of a trustee." Id.

*1104(a)(1)*

37. None of the factors that would support the appointment of a trustee under Bankruptcy Code § 1104(a)(1) are present.

38. Bankruptcy Code § 1104(a)(1) contemplates the appointment of a trustee in the case of fraud, dishonesty, incompetence, or gross mismanagement, whether pre- or post-Petition Date.

39. Prior to the Petition Date, Wilson served as President and CEO of the Debtor, and as the contracted manager by virtue of the CMS Management Agreement. Between 80% and 90% of the vendors providing goods and services to the Facility were related to Wilson. Thus, the Debtor's pre-Petition Date dealings and conduct are tied to the conduct and handling of Wilson, either individually or through his entities. Mr. Church has been qualified by Courts as a subject matter expert. In addition, he has hands on experience running and managing nursing care facilities.

40. Post-Petition Date, the Debtor has hired a series of seasoned professionals to guide it through both the bankruptcy case and the transition away from CMS and Wilson's management.

41. Robert Church is serving as the interim CEO. He is a managing director and Eisner Advisory Group, LLC. He has extensive knowledge in health care, health care fraud and abuse, white collar crime and related matters.

42. Through Mr. Church's oversight, the Debtor has been able to meet every requirement and deadline set by the Court and by the business needs and demands of the operation of the business. This includes, but is not limited to, finding replacement vendors, finding replacement insurance, finding a replacement management company, addressing employee related issues, and addressing state related issues. Mr. Church has been in the nursing home industry for over thirty years, administering, managing, and running nursing homes in 37 states over his tenure

43. Under Mr. Church's leadership, the Debtor is experiencing significant revenues, has a significant amount of cash in the bank, has significant a/r in the pipeline, has increased the number of residents at the facility, and it is expected the Debtor's operating costs are being

reduced.

44. All this has occurred, while, as this Court commented at the hearing on April 25, 2023, Mr. Wilson is trying to shut down the operations of the Debtor.

45. The Debtor's accountant, Susannah Prill, is a CPA, a senior manager at Eisner Advisory Group, LLC, and has experience in bankruptcy, health care and nursing home matters. Mr. Prill has been integral in understanding the past, present and future financial dealings and outlook for the Debtor. She has both forensic litigation, business valuation, and accounting support services experience. She has provided services in bankruptcy cases, has provided services to businesses in the health care industry and her department has provided services to nursing home facilities.

46. Such services have been essential in the successful transition from CMS as well as providing financial information to the bankruptcy estate.

47. The Debtor's new management company also plays a key role in the success of this reorganization. Vivage is a Colorado based company. Vivage provides consulting and management services to numerous health care facilities. It also has its own communities in Colorado, Wyoming and Nevada.

48. Vivage has over forty years experience in the nursing home industry, is an established operator, manager and business consultant for nursing home facilities. It is anticipated that Vivage will be able to provide goods and services to the Facility at a cost lower than those provided by the Wilson related entities.

49. The DIP Lending will provide a back stop to assure the estate has sufficient capital to pay is administrative claims as they come due.

50. The Debtor is financially stronger as a result of the experts retained in the case, the filing of this bankruptcy case and the divorce from CMS, Mr. Wilson and his related entities.

51. None of the allegations asserted by CMS and WH are supported by fact or support the appointment of a trustee. Many of Movants' arguments are addressed below.[2]

52. Shut Down Motion ¶ 55: A trustee is needed to immediately relocate residents.

---

2 To the extent the Debtor does not respond to a particular paragraph or a statement in a paragraph, such is not an admission that the statement is true, correct, accurate, or the argument has validity. Further, Movants' arguments may have been previously address and the positions are not repeated.

CMS and WH are putting the health and welfare of residents first.

> Debtor response: The only parties ringing this alarm are parties who stand to benefit if the Debtor's operations are shut down. As detailed in the Complaint filed in Adversary Proceeding No. 23-1085, and as the Court observed at the April 25, 2023, Mr. Wilson is making effort to shut down the Debtor. The Shut Down Motion is a part of this strategy. If the Debtor is unable to continue to successfully operate due to Movants' systematic attack on the operations of the Debtor, and the Debtor ceases operations, WH will act on its lien on the Debtor's assets, foreclosing on the Debtor's assets and collecting on its pre-Petition Date claim. In addition, Mr. Wilson will be able foreclose on the lien he holds against NSA, causing the Debtor to lose the facility in which it operates. Such would result in a termination of the Debtor's revenue stream to the detriment of parties in interest. It is important to note, neither the State of Colorado, the Ombudsman, the U.S. Trustee nor the SubV Trustee is raising alarms about the Debtor and its operation.

53. Shut Down Motion ¶ 62: The Debtor did not provide reports to the secured creditor. Debtor response: This statement is false. The only required report was the monthly operating report, which was filed and served upon counsel for the secured creditor via ECF. Further, the DIP Loan, if approved, moots this issue.

*1104(a)(2)*

54. Likewise, causes does not exist for the appointment of a trustee under Bankruptcy Code § 1104(a)(2).

55. The only party that will benefit from the shutdown of the Facility is Mr. Wilson.

56. Every other creditor, administrative claimant, and equity holder will be harmed and entirely out of the money if a trustee is appointed.

57. A trustee would be forced to take over operations of a skilled nursing home. The appointment of a trustee would stop the Debtor's continued path to a successful reorganization.

58. Most importantly, there are the health and safety of at least 92 residents will be placed at risk if the Facility is shut down. Mr. Wilson and his related entities likely knows this fact given his involvement in the industry. To the extent he did not, the Ombusman made this concern crystal clear at the April 25, 2023 hearing.

59. Lastly, there are 151 employees at the Facility who will be left unemployed if the

Facility is shuttered.

60. CMS and WH are taking no one and nothing else into consideration but their own self and financial interest.

61. There is no reason to harm every other person and entity related to the Facility, including creditors, residents, and employees under the current financial success of the Debtor.

WHEREFORE, the Debtor respectfully requests this Court deny the Shut Down Motion, and grant such other relief deemed appropriate.

Dated: May 15, 2023.        Respectfully submitted,

*/s/ Aaron A. Garber*
Aaron A. Garber #36099
WADSWORTH GARBER WARNER CONRARDY, P.C.
2580 West Main Street
 Suite 200
Telephone: (303) 296-1999
Telecopy: (303) 296-7600
agarber@wgwc-law.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 15, 2023 I served via ECF a copy of **OBJECTION TO MOTION TO APPOINT CHAPTER 11 TRUSTEE** on all parties against whom relief is sought and those otherwise entitled to service pursuant to FED.R.BANKR.P. and these L.B.R. at the following addresses:

Robert Samuel Boughner     Samuel.Boughner@usdoj.gov
Zachary Fairlie     zfairlie@spencerfane.com, lwhitaker@spencerfane.com
Joli A. Lofstedt     joli@jaltrustee.com, ecf.alert+Lofstedt@titlexi.com,brenda@jaltrustee.com
John A. O'Brien     jobrien@spencerfane.com, anissly@spencerfane.com;zbalog@spencerfane.com
Keri L. Riley     klr@kutnerlaw.com, vlm@kutnerlaw.com
Scott C. Sandberg     ssandberg@spencerfane.com, anissly@spencerfane.com;lwhitaker@spencerfane.com

US Trustee     USTPRegion19.DV.ECF@usdoj.gov

By: _/s/Nichole Garber_
For Wadsworth Garber Warner Conrardy, PC