## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:                                              )
                                                    )    Case No.  23-10809-JGR
NORTH SHORE MANOR, INC.,                             )
                                                    )    Chapter 11
Debtor.                                             )

### SUB-CHAPTER V PLAN OF REORGANIZATION DATED JULY 12, 2023

North Shore Manor, Inc. (the "Debtor" or "NSM"), the Debtor and Debtor-in-Possession herein, hereby proposes, pursuant to Sub-Chapter V of Chapter 11, Title 11 of the United States Code, the following Plan of Reorganization (the "Plan").

### INTRODUCTION

This Plan and the disclosures contained herein are being provided to all creditors and Interest holders of the Debtor.  This Plan is subject to confirmation pursuant to 11 U.S.C. Section 1191 by the United States Bankruptcy Court for the District of Colorado.  Issues related to the merits of the Plan and its confirmation will be the subject of a confirmation hearing pursuant to Order of the Court which will be served upon you.

**The disclosures contained herein have not been approved by the Securities and Exchange Commission.  The Securities and Exchange Commission has not reviewed the accuracy of adequacy of this document.**

The Plan is the governing document or contract with creditors once it is confirmed by the Court.

 **WARNING: IF YOU ARE A CREDITOR YOUR RIGHTS MAY BE IMPAIRED BY THE PLAN.**

### CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 of the Code is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals.  Chapter 11 allows the Debtor to retain its assets during administration of its Chapter 11 case as Debtor-in-Possession and following confirmation of a Plan as a reorganized Debtor or as provided in the Plan.  Once the Plan is confirmed by the Court, the Plan is the permanent restructuring of the Debtor's financial obligations.

The Plan divides creditors into Classes of similarly situated creditors.  All creditors of the

same Class are treated in a similar fashion.  All ownership Interests in the Debtor are also classified and treated alike.  Each Class of creditors or Interest holders is either impaired or unimpaired under the Plan.  A Class is unimpaired if the Plan leaves unaltered the legal, equitable and contractual rights to which each creditor in the Class is entitled.  Alternatively, a claimant is unimpaired if the Plan provides for the cure of a default and reinstatement of the maturity date of the Claim as it existed prior to the default.

The Bankruptcy Court set a bar date establishing May 15, 2023, as the last date for filing Proofs of Claim.  The Plan provides that Claims and Interests of all Classes shall be allowed only if evidenced by a timely filed Proof of Claim or Interest or which otherwise appear in the Schedules filed by the Debtor and are not scheduled as disputed, contingent, or unliquidated unless subsequently allowed by the Court.  Creditors may check as to whether their Claims have been scheduled as disputed, contingent, or unliquidated by reviewing the Schedules filed by the Debtor with the Court.  Alternatively, creditors may contact counsel for the Debtor directly to determine how they have been scheduled.

Bankruptcy Code § 1191 provides that confirmation of the Plan shall occur if the Plan satisfies all provision of 1129(a) except subparagraph 15 and 1191(c).

## BACKGROUND AND EVENTS LEADING TO CHAPTER 11 FILING

The Debtor is a Colorado corporation.  The Debtor is a skilled nursing facility located in Loveland, Colorado (the "Facility").  The Facility is a 120-bed skilled nursing facility using the trade name North Shore Health & Rehab. The Facility accepts Medicare, Medicaid, and private pay residents offering a full-spectrum of clinical care including a sub-acute rehabilitation care unit and a dedicated hospice care unit.  The Facility emphasizes the health of its residents in mind, body, and spirit and endeavors to meets each person's needs in a loving, caring manner with regard to each individual's dignity and strengths.

The Facility was constructed in 1974 through the efforts of four Jewish immigrant families that fled the atrocities of Eastern Europe in the wake of the Holocaust (the "Original Owners"). These Original Owners shared ownership of the Facility and the land on which it was built. The Facility was and is owned and operated by the Debtor and the land is owned by a land partnership called North Shore Associates ("NSA"), a general partnership which later became a Colorado

limited liability partnership ("LLP") with the same owners in the same equal proportion as the Debtor.

Shortly after its construction, the Facility employed J. Robert Wilson ("Wilson") in some capacity. By 1979, one of the Original Owners sought to exit the venture and sold his 25% ownership in both the Debtor and NSA, conveying 15% to Wilson and 10% to other then-existing owners. Shortly thereafter, in 1980, Wilson entered into an employment agreement with the Debtor to serve as General Manager of the Facility responsible for its day-to-day operations. At some point thereafter, Wilson was also appointed President of the Debtor, working alongside two other Original Owners that served in other officer capacities.

The Facility and the companies that owned it thrived over the next thirty years, generating substantial returns for its owners. In 1997, recognizing changes in Colorado law, the Debtor and NSA, with assistance of counsel, reconfigured its corporate structure and adopted new by-laws. At that time, Wilson remained as President of the Debtor, and by virtue of these new by-laws, its Chief Executive Officer.

During his tenure with the Debtor, Wilson created, among other entities, a group of entities which were are part of or related to Columbine Health Systems ("CHS"), and a management company called Columbine Management Services ("CMS"). On or about October 1, 2004, CMS entered into a Management Agreement (the "Management Agreement") with the Debtor wherein CMS would provide management services to the Debtor. Under the Management Agreement, CMS assumed all managerial responsibilities for operations of the Debtor's skilled nursing facility, including retaining and paying vendors, maintain the books and records, paying invoices, depositing income, paying employees, handling resident records. During CMS' tenor, entities owned by insiders of CMS were the majority (between 80% and 90%) of the Debtor's vendors (the "Wilson Vendors").

By the end of 2018, Wilson notified the shareholders of the Debtor that the company was no longer profitable and that distributions from the Debtor would cease until the business could be turned around. Nonetheless, Wilson assured the shareholders that change was on the horizon and that the Facility would again become profitable in short order.

In early 2020, the Facility and its operations were impacted by the onset of the COVID-19 pandemic. According to Wilson the facility was being propped up financially by government grants and subsidies.

3

On or around the beginning of 2022, Wilson notified certain shareholders of the Debtor that he intended to soon retire and that he was interested in selling the Facility as well as other CHS related facilities and affiliated businesses (the "CHS Businesses"). By March of 2022, Wilson notified certain shareholders of the Debtor that he had obtained a letter of intent ("LOI") from a prospective buyer for the Facility as well as the CHS Businesses.

In mid-summer 2022, Wilson, through his counsel, presented the shareholders of the Debtor and the partners of NSA with a purchase agreement (the "Purchase Agreement") to purchase the parties' interests in both companies for $12,000,000, from which certain debts would need to be repaid, and various items deducted from the purchase price, with the proceeds that remained flowing to the shareholders and partners. Closing of the Purchase Agreement was contingent upon Wilson's closing his accompanying deal for the CHS Businesses. Such debt payable from the proceeds of the Purchase Agreement included secured debt purportedly due and owing to Bank of Oklahoma and First National Bank of Omaha as well as over $800,000 in debt purportedly owed to Wilson personally.

By the end of October of 2022, Wilson informed the shareholders and partners that his deal to sell the CHS Businesses had fallen through and that Wilson was no longer interested in purchasing the shareholders and partners interest in the Debtor and NSA. At or around this time, Wilson also notified the shareholders and partners that the Debtor was in a tenuous cash position and that he was unwilling to continue inject his own capital into the business. Notwithstanding all of this, Wilson notified the shareholders of the Debtor by letter that he has changed his mind regarding retirement and that he intended to continue to operate and turnaround the Facility in short order.

Recognizing the extent of Wilson's complete control of the Debtor and NSA, in November 2022, the shareholders of the Debtor, including Wilson, adopted a resolution by unanimous written consent appointing a new board of directors for the Debtor (the "Board"). 85% of the partners of NSA also executed a resolution revoking the 2006 amendment to the NSA partnership agreement that appointed Wilson as Managing Partner of NSA with its attendant rights and obligations. The shareholders and partners retained a consultant to conduct an assessment of the Facility, its operations, and its finances.

On December 28, 2022, Wilson called the Board to discuss the status of the Facility. Wilson relayed that the Debtor was experiencing a turnaround financially and that there would be

no need for a cash infusion from shareholders.  Wilson also explained that, in effect, he had been front-running company shortfalls for several months, injecting hundreds of thousands of dollars into the business as needed to maintain cash-flow and then paying himself back when receivables came in.

In January 2023, the Board requested various substantive materials from Wilson and CHS to provide to the consultant in advance of their arrival.  CHS and Wilson did not provide the requested information.

On February 8, 2023, Mr. Paul Benigni ("Benigni"), then a senior Vice President of the Debtor's secured lender, on behalf of Wilson, reached out to the Board to discuss the cash position of the Debtor explaining that Wilson "cannot afford to continue this process" of injecting his own cash into the business and that Wilson "would like to know if a cash call will be made to the shareholders or if a debt restructure is in the works" of a debt set to mature on March 7, 2023.  On February 17, 2023, Wilson reached out directly to the Board and to the partners and shareholders explaining that he "can no longer fund the short term cash needs of North Shore" and recommended a capital call in the amount of $1,000,000. At that time, the Board felt obliged to find and retain bankruptcy counsel.

The Debtor's bankruptcy filing was prompted by the issues that existed between the Debtor and CMS and Wilson.  The Board was presented by Wilson and CMS with a grim cash position and an inability to fund operations.  The Board was concerned about the handling of the finances of NSM by CMS, including, but not limited to the Debtor's utilization of the Wilson Vendors and the loan transactions between NSM and Wilson.  The Debtor, through Wilson, guaranteed a promissory note with BOKF, NA d/b/a Bank of Oklahoma ("BOKF") and in conjunction therewith was led to believe granted a security interest in substantially all of its assets. The BOKF loan came due on March 7, 2023, the day after the bankruptcy filing.  The Debtor also entered into a secured loan with First National Bank n/k/a First National Bank of Omaha ("FNB") which comes due in the third quarter of 2023.

### DESCRIPTION OF ASSETS

Attached hereto as Exhibit A is a list of the Debtor's assets (the "Liquidation Analysis"). The Liquidation Analysis shows values for the Debtor's cash, accountants receivable, and fixed assets.  Taking into consideration net working capital adjustments, the Debtor's total asset value

is approximately $2,849,922. However, the full value of the Debtor's assets could not be realized if the Debtor were to be liquidated. Some residents, government aide, or families would not pay their outstanding obligations if the Debtor were liquidated and residents forced to relocate. If not sold as a going concern, but rather in a forced liquidation, fixed assets would have to be sold through a liquidator, causing a steep discount in value. Lastly, the Debtor's assets are subject to the lien of Loveland Health, LLC ("LHL"), who has provided a line of credit in the amount of $700,000. As of June 30, 2023, LHL had advanced a total of $433,951.46 plus accruing interest. LHL has a lien on substantially all of the assets of the Debtor. As shown on the Liquidation Analysis, in a liquidation, the Debtor's assets would on the low end of a recovery have a value of $2,235,740 and a high value of $2,380,488. The secured claim of LHL would further reduce the value of the assets of NSM in a liquidation.

**Preservation of Litigation Claims**

The Debtor is reserving the right to bring Avoidance Actions pursuant to 11 U.S.C. §§ 545 through 550 and state law based fraudulent conveyance actions. The Bankruptcy Code sets a 90-day look back period for creditors who are not insiders and one year for insiders. The Debtor's Statement of Financial Affairs discloses that there was a total of $2,280,577 within the 90 days prior to the Petition Date to a number of non-insider parties. A list of the transfers is attached hereto as Exhibit B.

With respect to insiders, the Debtor's Statement of Financial Affairs discloses a total of $5,166,829 in transfers. A list of the transfers is attached hereto as Exhibit C.

The Debtor is also reserving the right to bring any and all claims that may exist against Wilson and entities related to Wilson (the "Wilson Preserved Claims"), including without limitation CHS, CMS, and the Wilson Vendors (collectively, the "Wilson Entities"). Such preserved claims include all causes of action that exist in law and equity that against the Wilson Entities as a result of, among other things, the management of the Debtor by Wilson and CMS, Wilson's accrual and restructure of debt, the loans Wilson purportedly made to the Debtor, the dealings between the Debtor and the Wilson Vendors Wilson's efforts to negotiate the purchase of the shareholder and partner interests in the Debtor and NSA, and Wilson's handling of the purported loans made to the Debtor.

## DESCRIPTION OF LIABILITIES

### A.    Priority Claims

#### 1.  Priority Claims

Priority Claims are defined in the Plan as any pre-petition Claim entitled to a priority payment under § 507(a) of the Code, excluding any Administrative Claim or Tax Claims.  No claimants asserting a priority claim, excluding any Administrative Claim or Tax Claims, have filed a Proof of Claim, and the Debtor is currently unaware of any Priority Claims at this time.

#### 2.  Administrative Claims

Administrative Claims are those Claims for payment of an administrative expense of a kind specified in §503(b) or §1114(e)(2) of the Code and entitled to priority pursuant to §507(a)(2) of the Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estates and operating the businesses of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases; (b) Professional Fees; (c) any court approved fees and costs of the Sub-Chapter V Trustee; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Court under §503(b) of the Code.  The Administrative Claims, including the Professional Fees incurred during the case which remain unpaid, are as follows:

The Debtor retained Wadsworth Garber Warner Conrardy, P.C. ("WGWC") as its bankruptcy counsel.  WGWC has filed its first fee application seeking reimbursement of fees in the amount of $108,892.50 and costs in the amount of $530.03 (the "WGWC First Fee Application").  The WGWC First Fee Application was pending at the time of the filing of this Plan.  The Debtor provided WGWC with a retainer in the amount of $30,959.50 for post-petition services.  Assuming the Debtor pays the amounts due under the pending fee application, the Debtor estimates that there will be an Administrative Claim for unpaid legal fees owed to WGWC of at least $100,000 on the Effective Date of the Plan.  The legal fees could increase or decrease depending on the level of litigation in the bankruptcy case.

The Debtor retained Eisner Advisory Group, LLC ("EAG") as its accountant.  EAG has not yet filed its first fee application seeking reimbursement of fees but projects costs in the approximate amount of $121,000 and approximate costs in the amount of $5,000. The Debtor provided EAG with a retainer in the amount of $5,000 for post-petition services.  The Debtor

estimates that there will be an Administrative Claim for unpaid accounting fees owed to EAG of at least $125,000 on the Effective Date of the Plan. The accounting fees could increase or decrease depending on the level of litigation in the bankruptcy case.

The Debtor retained Levin Sitcoff Waneka PC ("LSW") as special counsel. To date, LSW did not provide any services during the bankruptcy case and it is anticipated that LSW will not hold a claim against the bankruptcy estate.

The fees of the Sub-Chapter V Trustee are estimated to not exceed $25,000. The fees could increase or decrease depending on the level of assistance required by the Sub-Chapter V Trustee to reach a consensual Plan.

The following creditors have filed requests for administrative claims pursuant to Code § 509(b), which claims are disputed by the Debtor, and a trial has been set for resolution of these claims:

   a. Centre Pharmacy, Inc.: $21,387.79

   b. Columbine Medical Equipment, Inc.: $16,724.75

   c. Columbine Distribution Center, LLC: $28,704.94

   d. Pourde Infusion Therapy, LLC: $7,769.31

Robert Church of EAG has been working as the interim CEO since on or around March 5, 2023 and has unpaid fees in the amount of $100,000.

The Debtor has an unpaid rent obligation owing to NSA in the amount of approximately $280,000 which will be paid as a part of the cure payment upon assumption of the NSA lease.

The Debtor has generally paid its other administrative expenses in the ordinary course of business during the course of the bankruptcy case, and, therefore, does not believe there will be any other material Administrative Claims asserted against the estate.

   **3. Tax Claims**

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. §507(a)(8). The Debtor did not schedule any Tax Claims and none have been asserted against the estate.

   **4. Secured Claims**

 **Loveland Health, LLC.** LHL satisfied the secured debt of Wapello Holdings II, LLC ("WHII"). WHII, prior to the Petition Date, purchased the secured debt of First National Bank of Omaha. On April 28, 2023, the Debtor, in conjunction with NSA, filed a Joint Motion for

Approval of Lending and Security Agreement and for Authority to Incur Debt on an Administrative and Secured Basis (the "DIP Financing Motion"). Objection to the DIP Financing Motion was filed by a number of the entities related to Wilson. After negotiation, the loan documents were revised and the Court entered an order approving the financing proposed in the DIP Financing Motion, as modified (the "DIP Financing"). The pertinent terms of the DIP Financing are:

a.  The Debtor was authorized to borrow up to $700,000 (the "Facility").

b.  The Facility is be used to first satisfy the WHII obligation.

c.  LHL was granted a security interest in substantially all of the assets of the Debtor.

d.  Interest accrues at a rate of 8% per annum.

e.  The Facility comes due the earlier of: a) the date the Note is accelerated after an Event of Default (including the appointment of a trustee or removal of a debtor as a debtor in possession); (b) the date the Borrower's Chapter 11 case is converted to a Chapter 7 case or dismissed; (c) one year from the date of this Lending Agreement; or (d) treatment under a confirmed Plan of Reorganization.

As of the date of the filing of this Plan, LHL had advanced $433,951.46. Additional funds may be advance to pay Administrative Claims and/or operating expenses.

**Larimer County Treasurer.** The Larimer County Treasurer is the holder of a secured Claim for 2022 ad valorem tax for personal property of the Debtor. The Larimer County secured tax claim is accruing at the statutory rate, 12%. The basis for perfection is statutory. The Larimer County Treasurer has asserted a secured claim in the amount of $12,958.30.

## C.    Non-Priority Unsecured Creditors

The Debtor scheduled a number of unsecured pre-petition debts. At least one of the unsecured creditors have filed Proofs of Claims. The bar date for filing Proofs of Claims against the Debtor is May 15, 2023. To the extent that a creditor files a Proof of Claim, the amount of the Claim as filed in the Proof of Claim will be used. The Claims list containing all known unsecured Claims against the Debtor, other than Claims secured by an asset of NSA, is attached hereto as Exhibit D. Exhibit D shows total general unsecured claims, other than Claims secured by an asset of NSA, in the amount of $2,167,583.78 having been asserted against the estate. This amount may be reduced to the extent the Wilson Entities hold Allowed Administrative Claims. The Debtor scheduled non-priority unsecured Claims in the amount of $1,698,573.

One general unsecured creditor who holds a Claim against the Debtor's estate also holds a secured claim against the assets of NSA: Wapello Holdings, LLC, who filed a general unsecured claim in the amount of $1,834,564.62.

**THE PLAN**

**ARTICLE I**

**DEFINITIONS**

1.01 – <u>Administrative Claim</u> shall mean a Claim for payment of an administrative expense of a kind specified in §§ 503(b) or 1114(c)(2) of the Code and entitled to priority pursuant to § 507(a)(2) of the Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estate and operating the business of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) Professional Fees; (c) any court approved fees and costs of the Sub-Chapter V Trustee; (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Court under § 503(b) of the Code.

1.02 – <u>Allowed Claim</u> shall mean a Claim in respect of which a Proof of Claim has been filed with the Court within the applicable time period of limitation fixed by the Court in the case or scheduled in the list of creditors prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, and as to which no timely objection to the allowance thereof has been filed pursuant to Rules 3001 and 3007 or as to which any such objection has been determined by a Final Order.

1.03 – <u>Allowed Secured Claim</u> shall mean an Allowed Claim secured by a lien, security interest or other charge against or interest in property in which the Debtor has an interest, or which is subject to setoff under § 553 of the Code, to the extent of the value (determined in accordance with § 506(a) of the Code) of the interest of the holder of any such Allowed Claim and the Debtor's interest in such property or to the extent of the amount subject to such setoff as the case may be.

1.04 – <u>Avoidance Actions</u> shall mean the Debtor's estate's interest in any and all claims, rights and causes of action which have been or may be commenced by or on behalf of the Debtor to avoid and recover any transfers of property determined to be preferential, fraudulent or otherwise avoidable pursuant to §§ 544, 545, 547, 548, 549, 550 or 553 of the Code, or under any other applicable law, or otherwise subject to equitable subordination under § 510 of the Code,

10

regardless of whether or not such actions have been commenced prior to the Effective Date of the Plan.

1.05 – <u>Claim</u> shall mean any right to payment, or right to any equitable remedy for breach of performance if such breach gives rise to the right to payment, against the Debtor in existence on or as of the Petition Date, whether or not such right to payment or right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, natured, unmatured, disputed, undisputed, legal, secured or unsecured.

1.06 – <u>Class</u> shall mean any Class into which Allowed Claims are classified pursuant to Article II of the Plan.

1.07 – <u>Class 1-5 Claims and Interests</u> shall mean the Allowed Claims and Interests so classified in Article II of the Plan.

1.08 – <u>Code</u> shall mean the Bankruptcy Code, 11 U.S.C. § 101 et seq. and any amendments thereof.

1.09 – <u>Confirmation Date</u> shall mean the date upon which the Order of Confirmation is entered by the Court.

1.10 – <u>Court</u> shall mean the United States Bankruptcy Court for the District of Colorado in which the Debtor's Chapter 11 case is pending, pursuant to which this Plan is proposed, and any Court having competent jurisdiction to hear appeal or certiorari proceedings therefrom.

1.11 – <u>Debtor</u> shall mean the Debtor who is proposing this Chapter 11 Plan.

1.12 – <u>Disputed Claim</u> shall mean any Claim which is not an Allowed Claim, including, without limitation, any Claim designated as disputed, contingent or unliquidated in the Debtor's schedules filed in connection with the case, or any Claim against which an objection to the allowance thereof has been interposed, and as to which no Final Order has been entered.

1.13 – <u>Effective Date of the Plan</u> shall mean the Confirmation Date.

1.14 - <u>Exculpated Claim</u> means any claim related to any act or omission in connection with, relating to or arising out of the Debtor's restructuring efforts prior to the Petition Date and through the Effective Date of the Plan, including without limitation formulation, preparation, dissemination, negotiation or filing of the Plan or any contract, instrument, release or other

agreement or document created or entered into in connection with this Plan, the filing of the Chapter 11 Case, the pursuit of confirmation of this Plan; provided, however, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud to the extent imposed by applicable non-bankruptcy law.

1.15 - Exculpated Party means each of: (a) the Debtor, (b) the Sub-Chapter V trustee, and (c) the current officers, directors, shareholders, members, managers, employees, advisors and attorneys in each of their respective official capacities acting on behalf of the Debtor and who participated in the reorganization process on behalf of and in the interest of the Debtor, and specifically Mayer Kohn, David Fogel, Boruch Levin, Robert Church, Mark Kohn, Josh Levin, Linda Fogel, Channa Levin, Mosh Levin, Esther Levin, Menachem Levin, Shoshanna Levin, Baruch Levin, Lynn Levin and professional retained in the bankruptcy case and the employees of such professionals.

1.16 – Final Order shall mean an order or judgment of the Court which shall not have been reversed, stayed, modified or amended and as to which (a) the time to appeal from or to seek review, rehearing or certiorari shall have expired, and (b) no appeal or petition for review, rehearing or certiorari is pending, or if appealed shall have been affirmed or the appeal dismissed by the highest court to which such order was appealed, or if review, rehearing or certiorari was sought, such review, rehearing or certiorari has been denied and no further hearing, appeal or petition for review, rehearing or certiorari can be taken or granted or as to which any right to appeal or to seek a review, rehearing or certiorari has been waived.

1.17 – Interest shall mean any member or shareholder interest or any other instrument evidencing any ownership interest in the Debtor and any option, warrant or right of any nature, contractual or otherwise, to acquire a member or other ownership interest in the Debtor.

1.18 – Net Sale Proceeds shall mean the gross sale proceeds on account of the sale of any asset of the Debtor, less payment of applicable taxes, closing costs and fees, brokers' commissions, legal fees or other costs and expenses associated with the sale of such asset, and any Claim encumbering such asset.

1.19 - Order of Confirmation shall mean the order entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Code.

1.20 – <u>Petition Date</u> shall mean March 6, 2023, the date on which the Debtor filed his Voluntary Petition.

1.21 – <u>Plan</u> shall mean this Plan of Reorganization, including all exhibits and schedules attached hereto or referenced herein or therein.

1.22 – <u>Priority Claim</u> shall mean any pre-petition Claim entitled to a priority in payment under § 507(a) of the Code but shall not include any Administrative Claim or Tax Claim.

1.23 – <u>Pro Rata</u> shall mean the ratio of an Allowed Claim or Interest in a particular Class to the aggregate amount of all Allowed Claims or Interests in that Class.

1.24 – <u>Professional Fees</u> shall mean the Administrative Claims for compensation and reimbursement submitted pursuant to §§ 330, 331 and 503(b) of the Code by a professional.

1.25 – <u>Rules</u> shall mean the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules for the District of Colorado as adopted by the Court.

1.26 – <u>Sale Proceeds</u> shall mean the gross sale proceeds on account of the sale of any asset of the Debtor, less payment of applicable taxes, closing costs and fees, brokers' commissions, legal fees, and other necessary costs of liquidation.

1.27 – <u>Tax Claim</u> shall mean any unsecured Claim of a governmental unit for taxes entitled to priority pursuant to § 507(a)(8) of the Code.

1.28 – <u>Unclassified Priority Claims</u> shall mean Claims pursuant to § 507(a)(1) and 507(a)(2) of the Code which are Administrative Claims allowed under § 503(b) of the Code and any fees and charges against the estates under Chapter 23 of Title 28 of the United States Code and shall further mean Allowed unsecured Claims of governmental units to the extent provided for in § 507(a)(8) of the Code.

1.29 – <u>Other Definitions</u>.  Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan but that is defined in the Code or Rules shall have the meaning set forth therein.

## ARTICLE II
## DESIGNATION OF CLAIMS AND INTERESTS

The following is a designation of all Classes of Claims and Interests other than those

Claims of a kind specified in Sections 507(a)(1), 507(a)(2), 507(a)(3) or 507(a)(8) of the Code.

<u>Class 1</u> – All Allowed unsecured Claims specified in Section 507(a)(4) and 507(a)(5) of the Code as having priority.

<u>Class 2</u> – The Allowed Secured Claim of Loveland Health, LLC or its successors and assigns.

<u>Class 3</u> – The Allowed Secured Claim of Larimer County Treasurer.

<u>Class 4(a)</u> – The Allowed Claims held by unsecured creditors that do not arise from a guarantee of a loan secured by property of NSA.

<u>Class 4(b)</u> - The Allowed Claim held by unsecured creditors that do arise from a guarantee secured by property of NSA.

<u>Class 5</u> – The Interests in the Debtor.

## ARTICLE III

## SPECIFICATION AND TREATMENT OF UNCLASSIFIED PRIORITY CLAIMS

As provided in Section 1123(a)(1) of the Code, the Claims against the Debtor covered in this Article II are not classified.  The holders of such Allowed Claims are not entitled to vote on the Plan.

3.1 – The holders of Allowed Claims of the type specified in Section 507(a)(2) of the Code, Administrative Claims, shall be paid within five (5) business days of the Effective Date of the Plan.  To the extent that any Administrative Claim is allowed after the Effective Date of the Plan, such Administrative Claim shall be paid within five (5) business days of allowance.

3.2 – The Allowed Claims of a type specified in Section 507(a)(8) of the Code, Tax Claims of governmental taxing authorities, shall be paid in full within five years of the Effective Date of the Plan. The Debtor is currently unaware of any Tax Claims.

## ARTICLE IV

## SPECIFICATION AND TREATMENT OF CLASS 1 PRIORITY CLAIMS

4.1 - Allowed Class 1 Priority Claims shall be paid on the later of (a) five (5) day of the Effective Date of the Plan, or (b) five (5) days of allowance.  The Class 1 Priority Claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4) and 507(a)(5) of the Code.  The Debtor is currently unaware of any Allowed Class 1

14

Priority Claims.

## ARTICLE V

## SPECIFICATION AND TREATMENT OF SECURED CLAIMS

5.1 – **Class 2, Loveland Health, LLC or its successors and assigns.**

The Class 2 Allowed Secured Claim shall be treated under this Plan as follows:

a. The Class 2 Secured Claim shall accrue interest at the rate called for under the applicable loan documents.

b. The Class 2 Secured Claim shall be amortized over five years from the Effective Date of the Plan, and shall be paid in equal monthly payments.

c. To the extent that the Debtor generates Sale Proceeds from the sale of any collateral of the Class 2 claimant, such Sale Proceeds shall be used to satisfy the Class 2 Secured Claim after satisfaction of the Allowed Secured Claim of the Loveland County Treasurer. To the extent that the Sale Proceeds are insufficient to satisfy the Class 2 Secured Claim in full, the unpaid portion of the Class 2 Claim shall be treated as a unsecured claim pursuant to Code § 506.

d. The Class 2 claimant is enjoined and barred from taking any action to collect upon its Claim or take action against its collateral unless and until there is a default under this Plan with respect to the Class 2 claimant.

5.2 – **Class 3, Loveland County Treasurer.**

The Class 3 Allowed Secured Claim shall be treated under this Plan as follows:  The Class 3 Secured Claim shall be allowed in the full amount due and owing.

a. The Class 3 Secured Claim shall continue to accrue interest at the statutory rate, 12%.

b. The Class 3 Secured Claim shall be amortized over five years from the Effective Date of the Plan, and shall be paid in equal monthly payments.

c. To the extent that the Debtor generates Sale Proceeds from the sale of any collateral of the Class 3 claimant, such Sale Proceeds shall be used to satisfy in full the Class 3 Secured Claim before any other Claim is paid under this Plan.

15

d.   The Class 3 claimant is enjoined and barred from taking any action to collect upon its Claim or take action against its collateral unless and until there is a default under this Plan with respect to the Class 3 claimant.

## ARTICLE VI

## SPECIFICATION AND TREATMENT OF UNSECURED CREDITOR CLAIMS

6.1 – **Class 4(a), General Unsecured Allowed Claim, do not arise from a guarantee secured by property of NSA.** - Class 4(a) consists of the general unsecured creditors of the Debtor who hold Allowed Claims that do not arise from a guarantee secured by property of NSA.  Class 4(a) shall be treated as set forth below:

a.   Holders of Class 4(a) Allowed Claims shall share on a Pro Rata basis monies deposited into the Unsecured Creditor Account as set forth herein.  The Debtor shall deposit on the first day of the month of the first full month after the Effective Date of the Plan until the earlier of either Class 4(a) general unsecured creditors are paid in full or five years from the Effective Date of the Plan: (a) for the first twelve months, $12,150.41 monthly for approximately $145,805 total over the twelve month period; (b) for months thirteen through twenty-four, $18,634.25 monthly for $223,611 over the twelve month period; (c) for months twenty-five through thirty-six, $21,862 monthly for approximately $262,354 over the twelve month period; (d) for months thirty-seven through forty-eight, $23,326.08 monthly for approximately $279,913 over the twelve month period; and (e) for months forty-nine through sixty, $30,783.66 monthly for approximately $369,404.  At the end of each calendar quarter, the balance of the Unsecured Creditor Account will be distributed to any unpaid Allowed Administrative Claims until paid in full and then to Class 4(a) general unsecured creditors that hold Allowed Claims on a Pro Rata basis.

b.   To the extent that the Debtor generates Net Sale Proceeds, such Net Sale Proceeds shall be deposited into the Unsecured Creditor Account and within 30 days shall be distributed to any unpaid Allowed Administrative Claims until paid in full and then to Class 4(a) general unsecured creditors that hold Allowed Claims on a Pro Rata basis. If all of the Debtor's assets are liquidated, then the Debtor's obligation under 6.1(a) of this Plan shall be voided.  The Debtor shall not sell its assets and generate Net Sale

16

Proceeds unless the Sale Proceeds provide a minimum distribution to Class 4(a), including any payments already made to Class 4(a), that is equal to or greater than if the Debtor were to make all the payments provided for in paragraph 6.1(a) of this Plan.

6.2 – **Class 4(b), General Unsecured Claims arising from a guarantee of a loan secured by property of NSA** - Class 4(a) consists of the general unsecured creditors of the Debtor who hold Allowed Claims arising from personal guaranties of the Debtor that is secured by property of NSA. Class 4(a) Allowed Claims shall be satisfied of the assets of NSA and shall not receive a distribution under this Plan.

## ARTICLE VII
## SPECIFICATION AND TREATMENT OF CLASS 5 INTERESTS

7.1 – Class 5 includes the Interests of the Debtor, which Interests are unimpaired by the Plan. Upon confirmation of the Plan, the interest holders in the Debtor shall continue to maintain their interests in the Debtor unless the Debtor's assets are liquidated. If the Debtor's assets are liquidated, then the Interest of the Debtor shall be cancelled and the Debtor shall continue to exist to distribute the Net Sale Proceeds.

## ARTICLE VIII
## MEANS FOR THE PLAN'S EXECUTION

8.1 – Operation of Business. The Debtor shall be empowered to take such action as may be necessary to perform its obligations under this Plan.

8.2 – Effectuating the Plan. On the Effective Date of the Plan, Mayer Kohn, David Fogel, and Boruch Levin (collectively, the "Board"), or such other person as the Board may designate from time and time shall serve as the agent pursuant to 11 U.S.C. §1142(b) for the purpose of carrying out the terms of the Plan, and taking all actions deemed necessary or convenient to consummating the terms of the Plans, including, but not limited to, executing documents.

8.3 – Sale Proceeds/Net Sale Proceeds – The Debtor has two alternatives under the Plan to make distributions to general unsecured creditors, either to pay its disposable income over the five year term of the Plan or at any point during the five year term of the Plan sell substantially all of its assets. If the Debtor elects to sell its assets, the sale procedures attached hereto as Exhibit E

17

shall govern the sale process.

8.4 – Disputed Claim Procedure.  Distributions to any Class of creditors will only be made on account of Allowed Claims.  In the event that distributions are made at a time that a Claim objection is pending before the Court or a judgment has entered to establish a Claim and the judgment is not subject to a Final Order, the portion of the distribution that would be paid to the disputed claimant will be held by the Debtor in an interest-bearing bank account until the Claim is allowed or disallowed.  If allowed, the Claim will be paid its appropriate share of the withheld payment.  If disallowed, the withheld distribution will be paid on a Pro Rata basis to the remaining impaired claimants of the Debtor who hold Allowed Claims, or if all holders of Allowed Claims have been paid in full, paid to the Debtor.

8.5 – Claims and Litigation Bar Date and Standing.  All Claim objections and Avoidance Actions in the case must be filed by the later of (a) limitation period set forth in § 546(a) of the Code, or (b) ninety (90) days following the Effective Date of the Plan.  The Debtor shall have standing to commence, prosecute, and settle Claim objections and Avoidance Actions without need for Court approval. The Debtor has retained Wadsworth Garber Warner Conrardy, P.C. to litigate any Claim objections and Avoidance Actions on an hourly basis and/or a contingency fee basis, as he determines is reasonable and in the best interest of the estate.

8.6 – Administrative Expense Bar Date.  All applications for allowance and payment of Administrative Claims, including Professional Fees, must be filed within ninety (90) days following the Effective Date of the Plan.

8.7 – Monthly Installments.  Whenever the Plan provides for payment in monthly installments or a payment due in a certain month, the payment shall be due on the last day of the calendar month in which the payment is due, unless otherwise specified in the Plan.  The Debtor shall then have a seven (7) day grace period within which the monthly payment must be received by the payee before the Debtor shall be in default unless a longer period is specified elsewhere in the Plan.

8.8 – Final Decree.  The Debtor will request entry of a final decree closing the case on or before the later of the date all Claim objections and any pending litigation is concluded or one hundred eighty (180) days after the Effective Date of the Plan or as otherwise in compliance with orders of the Court and the Bankruptcy Code and Rules, or such other time as is appropriate under

the proceedings of the case.

8.9 – Exemption from Transfer Taxes.  Pursuant to Section 1146(c) of the Code, the issuance, transfer, or exchange of notes or equity securities under the Plan by the Debtor, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or the making or delivery of any deed or instrument of transfer under, in furtherance of, or in connection with the Plan or the Agreements shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

8.10 – Contractual Relationship.  The Plan, upon confirmation, constitutes a new contractual relationship by and between the Debtor and its creditors.  In the event of a default by the Debtor under the Plan, creditors shall be entitled to enforce all rights and remedies against the Debtor for breach of contract, the Plan.  Any secured creditor claiming a breach of the Plan by the Debtor will be able to enforce all of its rights and remedies under its security documents, including foreclosure of its deed of trust, security agreement, lien, or mortgage pursuant to the terms of such document.  Any creditor claiming a breach by the Debtor must provide written notice to the Debtor of the claimed default, the notice must provide the Debtor a fourteen (14) day period within which to cure the claimed default, unless a longer period is specified elsewhere in the Plan.  Upon the Debtor's failure to cure the default within such fourteen (14) day period, the creditor may proceed to exercise its rights and remedies.  To be clear, contracts are only being modified as set forth in this Plan.

8.11 – Injunction.  The injunctions contained in Bankruptcy Code § 362(a) shall continue against any creditor or other party holding a Claim against the Debtor or estate assets during the term of the Plan except as provided herein.  This injunction shall not apply if the Court determines the Debtor defaulted under the Plan.

8.12 – Exculpation. Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, or liability for any Exculpated Claim, except for gross negligence or willful misconduct (to the extent such duty is imposed by applicable non-bankruptcy law). Each Exculpated Party has, and upon entry of the Order of Confirmation, shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law with regard to the solicitation and

19

distribution of this Plan, and shall not be liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan.

**ARTICLE IX**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

9.1 – On the Effective Date of the Plan, the Debtor does hereby assume those executory contracts and unexpired leases not expressly rejected or which have not been assumed by order of the Court prior to the Confirmation Date.  On the Confirmation Date, the Debtor shall be the holder of all right, title and interest to the assumed leases and contracts and such assumed leases and contracts shall be in full effect and binding upon the Debtor and the other parties thereto. Confirmation of the Plan shall constitute a determination that the payments to be made to said creditors pursuant to the Plan satisfy all conditions precedent to assumption and assignment set forth in § 365(b) and (f) of the Code.

Unexpired leases and executory contracts being assumed by the Debtor include but are not limited to the Medical Services Agreement with the City of Fort Collins, the Accent Hospice agreements, the Horizon Laboratory services agreement, the United Health Care provider agreement, the United Physicians of Northern Colorado provider agreement, the HHS/CMS Medicare Enrollment Agreement, the Ancillary Participation Agreement with Humana, Inc., Health Value Management Inc. d/b/a ChoiceCare Network, Humana Military, and their affiliates, the real estate lease with Associates.

9.2 – On the Effective Date of the Plan, the Debtor does hereby reject all executory contracts and unexpired leases to which it is a party for which a motion is pending or for which have been rejected by order of the Court prior to the Confirmation Date and as provided herein. Executory contracts and unexpired leases will be rejected pursuant to the provisions of § 365 of the Code.

9.3 – Confirmation of the Plan constitutes approval by the Court of the rejection of the executory contracts and unexpired leases described herein in accordance with the provisions of § 365 of the Code and the Rules.

9.4 – Claims Arising from Rejection.  All Proofs of Claim with respect to Claims arising from the rejection of any executory contract or unexpired lease shall be filed with the Court within

20

twenty (20) days after the earlier of: (i) the date of the Court's order approving the rejection of such executory contract or unexpired lease; (ii) rejection by operation of law under the Code; or (iii) the Confirmation Date.  Any Claims not filed within such time shall be forever barred against the Debtor, his estates and property, and any such Claims shall be disallowed in full.  Claims arising from such rejection, to the extent allowed, shall be treated as Class 8 unsecured Claims.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

10.1 – Revestment.  Upon the Debtor meeting all of its obligations under this Plan, or if necessary to effectuate a sale of the Debtor's assets, all property of the estate shall revest in the Debtor free and clear of all liens except those specifically set forth in the Plan or as otherwise provided in the Plan.

10.2 – Retention of Jurisdiction.  Notwithstanding confirmation of the Plan, the Court shall retain jurisdiction for the following purposes:

(a)  Determination of the allowability of Claims upon objection to such Claims by the Debtor or by any other party in interest;

(b)  Determination of the request for payment of Claims entitled to priority under § 507(a)(2) of the Code, including compensation of the parties entitled thereto;

(c)  Resolution of any disputes regarding interpretation of the Plan;

(d)  Implementation of the provisions of the Plan and entry of orders in aid of consummation of the Plan, including without limitation, appropriate orders to protect the revested Debtor from action by creditors;

(e)  Modification of the Plan pursuant to § 1127 of the Code;

(f)  Adjudication of any causes of action, including Avoidance Actions, brought by the Debtor, by the representative of the estate or by a Trustee appointed pursuant to the Code;

(g)  Adjudication of any cause of action brought by the Debtor, by a representative of the estate, or by a Trustee appointed pursuant to the Code, or the revested Debtor exercising rights and powers as provided in §§ 542-549 of the Code and the Wilson Preserved Claims.  This section shall not be construed to limit any other power or right which the Debtor may possess under any section of the Code;

21

(h)      Adjudication of the Wilson Preserved Claims; and

(i)       Entry of a final decree.

10.3 – Satisfaction of Claims.  If the Plan is confirmed under § 1191(a), on the effective date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code. The Debtor will not be discharged from any debt: (i) imposed by this Plan; or (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

If the Plan is confirmed under § 1191(b), confirmation of the Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due under the Plan within the first five years of the Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt: (i) on which the last payment is due after the 5 year term of the Plan, or as otherwise provided in § 1192; or (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.  The Debtor shall receive a discharge pursuant to Sections 1192 and 1141(d) of the Code.

Confirmation of the Plan and the occurrence of the Effective Date of the Plan shall constitute a modification of any note or obligation for which specification and treatment is provided under the Plan as set forth in the Plan.  Any obligation or note, previously in default, so modified, shall be cured as modified as of the Effective Date of the Plan.  This provision shall be operable regardless of whether the Plan provides for any obligation to be evidenced by a rewritten loan or security document following confirmation of the Plan.

10.4 – Headings.  The headings used in the Plan are for convenience of reference only and shall not limit or in any manner affect the meaning or interpretation of the Plan.

10.5 – Notices.  All notices, requests, demands, or other communications required or permitted in this Plan must be given in writing to the party(ies) to be notified.  All communications will be deemed delivered when received at the following addresses:

      a.      To the Debtor:
North Shore Manor
201 Columbine St., Suite 15
PO Box 6362
Denver, CO 80206

With a copy to:
Aaron A. Garber
Wadsworth Garber Warner Conrardy, P.C.
2580 West Main Street, Suite 200
Littleton, CO 80120
Email: agarber@wgwc-law.com

b.  To an allowed claimant, at the address set forth in the allowed Proof of Claim, if filed, or at the address set forth for the claimant in the Debtor's Schedules filed with the Court.

10.5 – Successors and Assigns.  The Plan will be binding upon the Debtor, any creditor affected by the Plan and its heirs, successors, assigns and legal representatives.

10.6 – Unclaimed Payments.  If a person or entity entitled to receive a payment or distribution pursuant to this Plan fails to negotiate a check, accept a distribution, or leave a forwarding address in the event notice cannot be provided as set forth in paragraph 10.5 of the Plan, within six months of the Effective Date of the Plan, the person or entity is deemed to have released and abandoned any right to payment or distribution under the Plan.

## ARTICLE XI
## CONFIRMATION REQUEST

11.1 – The Debtor, as the proponent of the Plan, request confirmation of the Plan pursuant to § 1191(a) of the Code. Confirmation of the Plan will be sought under Code § 1191(b) if all applicable requirements of § 1129(a), other than paragraphs (8), (10), and (15) of that section are met with respect to the Plan. To be confirmed under § 1191(b), the Plan must not discriminate unfairly and must be fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan. To be fair and equitable, § 1191(c)(2) requires that the Plan, among other things, provides that all of the projected disposable income of the Debtor to be received during the five year Plan term, beginning on the date that the first payment is due under the Plan will be applied to make payments under the Plan. In this case, the amount that the Debtor propose to contribute to the Plan meets the requirements of § 1191(c)(2).

### PLAN FEASIBILITY

The Debtor believes that the Plan, as proposed, is feasible.  Attached hereto as Exhibit F is

the Debtor's projections for the five year term of the Plan ("Projections").

It is projected that the Debtor will have, other than outstanding ordinary course business operation expenses, Administrative Claims in the amount of $250,000 due on the Effective Date of the Plan.  The Projections show the Debtor will have sufficient cash to pay Administrative Claims in full on the Effective Date of the Plan.  The Projections also show the Debtor has sufficient cash on hand over the term of the Plan to pay any additional administrative claims or cure obligations that may arise after the Effective Date of the Plan.

In the first year of the Plan term the Debtor projects it will have gross revenue of $13,200,000 and $13,054,195 in expenses leaving $145,805 in disposable income which is being dedicated under the Plan.

In the second year of the Plan term the Debtor projects it will have gross revenue of $13,596,000 and $13,372,389 in expenses leaving $223,611 in disposable income which is being dedicated under the Plan.

In the third year of the Plan term the Debtor projects it will have gross revenue of $14,139,840 and $13,877,486 in expenses leaving $262,354 in disposable income which is being dedicated under the Plan.

In the fourth year of the Plan term the Debtor projects it will have gross revenue of $14,776,133 and $14,496,220 in expenses leaving $279,913 in disposable income which is being dedicated under the Plan.

In the fifth year of the Plan term the Debtor projects it will have gross revenue of $15,514,939 and $15,145,535 in expenses leaving $369,404 in disposable income which is being dedicated under the Plan.

## TAX CONSEQUENCE

The Debtor is not providing tax advice to creditors or Interest holders.  Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation.  Generally, unsecured creditors should have no tax impact as a result of Plan confirmation.  The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year, in which case income may have to be recognized.  Interest holders may have very complicated tax effects as a result of Plan confirmation.

## LIQUIDATION ANALYSIS UNDER CHAPTER 7

The principal alternative to the Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Code.  Chapter 7 requires the liquidation of the Debtor's assets by a Trustee who is appointed by the United States Trustee's office.  In a Chapter 7 case, the Chapter 7 Trustee would take over control of the assets.  Secured creditors may seek relief from the automatic stay to foreclose upon their collateral, the Debtor's asset.  The assets would be liquidated and the proceeds distributed to creditors in the order of their priorities.

As described in the asset section of this Plan, and as set forth in the Liquidation Analysis, the Debtor's total asset value in a liquidation is on the low end approximately $2,235,740 and on the high end approximately $2,380,488, not including avoidance actions and other litigation, which have the same value in a Chapter 7 as a Chapter 11.  Under the low end analysis, pursuant to Bankruptcy Code § 326, assuming an asset value of $2,235,740 then a Chapter 7 trustee would receive compensation of $90,322.  Under the high end analysis, assuming an asset value of $2,380,488, a Chapter 7 trustee would receive compensation of $94,664.

For purposes of this liquidation analysis the Debtor will use the average of the high end and low end analysis as reflected in the Liquidation Analysis.  Thus, it is projected that the Debtor's assets in a liquidation will total $2,308,114.  With an asset value of $2,308,114, the Chapter 7 trustee would receive a commission of $92,493.  In addition, the Chapter 7 trustee would incur professional fees (i.e., attorney and accountant) of $50,000, not including litigation costs.  Thus, there would be $2,165,621 for distribution to creditors. First, Chapter 11 priority claims would be paid, which for purposes of this analysis only are projected to total $200,000.   Then there would be outstanding obligations in the Chapter 11 from running the facility, such as salary, rent, and obligations of the caring for the patients, which Administrative Claims, plus the Code § 503(b)(9) claims, are projected to total $976,406. [1] Then there is the cost to winddown the facility.  A Chapter 7 trustee would have to care for the residents until the close down and transfer of all residents was completed.  Since the Chapter 7 trustee would have no experience in running the facility, the management company would have to be retained.  It is assumed the cost of the winddown would be high given a Chapter 7 trustee would not have any experience in the industry. As set forth in

---

[1] For purposes of this analysis the full amount of the asserted administrative claims of the Wilson Entities are utilized, which totals $74,586.79.  The Debtor disputes the asserted administrative claims, which amount may be reduced by the Court.

the Liquidation Analysis it is projection that in a Chapter 7 the winddown would cost $743,500. Then the Secured Claim of LHL would be paid to the extent proceeds exists.  In a Chapter 7 liquidation, after the payment of Chapter 7 administrative claims, Chapter 11 priority claims, the winddown costs, and the LHL secured claim, there would be no remaining proceeds to pay to general unsecured creditors. Under this scenario, in a Chapter 7 all creditors holding Allowed Unsecured Claims would receive a pro rata distribution of 0%.[2]

If the Chapter 11 case proceeds to confirmation, Administrative Claims will be paid in the ordinary course, there will be no wind down expense, and the LHL Secured Claim will be paid as proposed herein.  It is projected that the Debtor will have unpaid professional fees of $225,000 on the Effective Date of the Plan.  The Debtor will have sufficient cash on hand to satisfy this obligation.  The Plan provides for payments up to $1,281,086.59 from the Debtor's disposable income over five years. Assuming for purposes of this analysis Class 4(a) Allowed Claims will total $2,092,996.99, it is projected Class 4(a) unsecured creditors will be paid a pro rata distribution of 61%.  If the Debtor prosecutes and prevails on any claim objections, then the percentage distribution to unsecured creditors will increase.

DATED: July 12, 2023

NORTH SHORE MANOR, INC.


By: */s/ Robert Church*
        Robert Church, Interim CEO


WADSWORTH GARBER WARNER CONRARDY, PC


By:   */s/ Aaron Garber*
        Aaron A. Garber #36099
        Wadsworth Garber Warner Conrardy, P.C.
        2580 West Main Street, Suite 200
        Littleton, CO 80120
        Telephone: (303) 296-1999
        Telecopy: (303) 296-7600
        Email: agarber@wgwc-law.com


ATTORNEYS FOR DEBTOR AND DEBTOR-IN-POSSESSION

---

[2] As set forth in the Liquidation Analysis, under a high end recovery, general unsecured creditors would receive a distribution of 15%.

EXHIBIT A

**LIQUIDATION ANALYSIS**
**North Shore Manor**

| | Notes | Amount | Recovery (%) Low | Recovery (%) High | Recovery ($) Low | Recovery ($) High | Recovery ($) Average |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Cash | 1 | $ 1,410,905 | 100% - | 100% | $ 1,410,905 - | $ 1,410,905 - | $ 1,410,905 |
| Accounts Receivable | 2 | 1,210,411 | 75% - | 85% | 907,808 - | 1,028,849 - | 968,329 |
| Net Working Capital Adjustments | 3 | (110,067) | 100% - | 100% | (110,067) - | (110,067) - | (110,067) |
| Fixed Assets | 4 | 338,673 | 8% - | 15% | 27,094 - | 50,801 - | 38,947 |
| Other Assets | 5 | - | 0% - | 0% | - - | - - | - |
| **Total Assets** | | 2,849,922 | | | 2,235,740 | 2,380,488 | 2,308,114 |
| **Less:** | | | | | | | |
| Administrative Expenses | 6 | | | | (1,150,906) - | (801,906) - | (976,406) |
| Estimated Tax Claims | 8 | | | | - - | - - | - |
| Chapter 7 Trustee Fees | 9 | | | | (90,322) - | (94,664) - | (92,493) |
| Wind Down Costs | 10 | | | | (842,000) - | (645,000) - | (743,500) |
| Chapter 11 Professional Fees | 11 | | | | (225,000) - | (175,000) - | (200,000) |
| | | | | | (2,308,228) - | (1,716,570) - | (2,012,399) |
| **Proceeds Available for Distribution to Creditors** | | | | | (72,488) | 663,918 | 295,715 |
| **Less:** | | | | | | | |
| Secured claims | | | | | (411,681) - | (411,681) - | (411,681) |
| **Proceeds Available for Distribution to Unsecured Claims** | | | | | | | |
| Unsecured Claims | 12 | | | | 2,133,310 | 1,683,739 | 1,908,525 |
| $ Recovery | | | | | (484,169) | 252,237 | (115,966) |
| % Recovery | | | | | -22.7% | 15.0% | -3.9% |

Note: Preliminary analysis and subject to change.
1. Cash balance as of June 30, 2023.
2. Accounts Receivable balance as of June 30, 2023.
3. Outstanding Checks.
4. Net book value at June 30 2023.
5. TBD
6. See attached Schedule.
7. North Shore Associates Lease Obligation, scheduled and claimed.
8. Potential recovery amounts are undeterminable at this point.

10. See attached Schedule.
11. See attached Schedule

**EXHIBIT B**

**Form b 207**
**Part 2: List Certain Transfers Made Before Filing for Bankruptcy**
**3. Certain payments or Transfers to Creditors within 90 Days of Filing**

| Creditor Name | Amount | Reason |
|---|---|---|
| Abigale Durocher Total | (130.95) | Employee |
| Abrianna E. Smiley Total | (2,659.51) | Employee |
| Amelia  A. Hess Total | (1,616.02) | Employee |
| Anthony D. Barragan Total | (5,005.29) | Employee |
| Ashley H. Vinnetsky Total | (5,860.05) | Employee |
| Bettie J. Padilla Total | (2,300.47) | Employee |
| Bosch Erickson Total | (354.97) | Employee |
| Camryn Elizabeth Gerardy Total | (2,090.33) | Employee |
| Carla Arellano Total | (2,086.26) | Employee |
| Charla Leighton Total | (7.80) | Employee |
| Christina J. Cavazos Total | (13,157.72) | Employee |
| Claudia Barajas Total | (257.92) | Employee |
| Connie Goldstein Total | (2,052.50) | Employee |
| Dana Voorhees Total | (207.36) | Employee |
| Dante  B. Javier Hodge Total | (5,658.33) | Employee |
| Deanna Dow Total | (3,863.09) | Employee |
| Derek Pritchard Total | (642.49) | Employee |
| Donald Goss Total | (54.03) | Employee |
| Edith Donnelly Total | (1,913.75) | Employee |
| Evalyne C. Kebenei Total | (3,739.44) | Employee |
| Evelyne Kebenei Total | (3,964.52) | Employee |
| Gilliann M. Martinez Total | (990.46) | Employee |
| Heather Aberdeen Total | (914.97) | Employee |
| Irene Cross Total | (6,243.00) | Employee |
| Ivy G. Smith Total | (6,178.70) | Employee |
| Jackie Avitia Total | (146.27) | Employee |
| Jacqueline E. Mejia Rodas Total | (4,030.10) | Employee |
| Janice K. Brown Total | (10,156.59) | Employee |
| Jasmine M. Lee Total | (5,614.20) | Employee |
| Jasper May Total | (3,579.79) | Employee |
| Jerry Knutson Total | (2,331.00) | Employee |
| Jestina McDonough Total | (48.24) | Employee |
| Joan K Turner Total | (7,182.00) | Employee |
| Joanna J. Jessen Total | (467.77) | Employee |
| Kate Billesbach Total | (659.55) | Employee |

**Form b 207**

**Part 2: List Certain Transfers Made Before Filing for Bankruptcy**

**3. Certain payments or Transfers to Creditors within 90 Days of Filing**

| Creditor Name | Amount | Reason |
|---|---|---|
| Keira D. Parks Total | (4,312.97) | Employee |
| Kellie Chambers Total | (1,350.33) | Employee |
| Kelly Sellmer Total | (263.59) | Employee |
| Madison E. Kaveny Total | (1,437.09) | Employee |
| Mary Ball Total | (5,313.42) | Employee |
| Maura Margarita Esquivel De Rios Total | (1,806.68) | Employee |
| Melinda Granados Total | (7,925.99) | Employee |
| Melissa Novakovich Total | (2,980.88) | Employee |
| Michael Mcirvin Total | (450.78) | Employee |
| Michelle Stauffer Total | (516.36) | Employee |
| Mikkhi M. Sedey Total | (618.24) | Employee |
| Nicole M. Perez Total | (703.72) | Employee |
| Norma Margarito Total | (189.61) | Employee |
| Pamela K. York Total | (3,031.10) | Employee |
| Payroll Company Direct Deposit Total | (1,041,200.52) | Employee |
| Payroll Company transfers, not DD Total | (500,347.50) | Employee |
| Peggy Deloge Total | (1,330.79) | Employee |
| Qyra Day Total | (73.29) | Employee |
| Rachel Vokey Total | (197.70) | Employee |
| Rachelle Rebhan Total | (863.13) | Employee |
| Ramona June Kissock Total | (1,512.00) | Employee |
| Sean P. McBride Total | (2,635.75) | Employee |
| Sherri Kay Gallatin Total | (8,773.53) | Employee |
| Tiffany M. Cook Total | (2,990.67) | Employee |
| Vanessa Gonzales Total | (947.25) | Employee |
| Weetherson Pierre Total | (2,729.10) | Employee |
| J Robert Wilson Total | (30,432.95) | Other |
| All State Pumping & Consulting Total | (1,379.00) | Supplier or Vendor |
| Alliance Protection, Ltd Total | (424.56) | Supplier or Vendor |
| Alsco - Laramie Total | (414.63) | Supplier or Vendor |
| Anlance Protection, Ltd Total | (215.76) | Supplier or Vendor |
| Bajuj Family Trust Total | (1,998.00) | Patient trust fund |
| Banner Health RT Total | (72.90) | Supplier or Vendor |
| Briggs Healthcare Total | (125.18) | Supplier or Vendor |
| CDW Government Total | (4,287.79) | Supplier or Vendor |

**Form b 207**

**Part 2: List Certain Transfers Made Before Filing for Bankruptcy**

**3. Certain payments or Transfers to Creditors within 90 Days of Filing**

| Creditor Name | Amount | Reason |
|---|---|---|
| Century Link Total | (528.59) | Supplier or Vendor |
| City of Loveland Total | (26,325.54) | Supplier or Vendor |
| Clean Designs, Inc Total | (607.64) | Supplier or Vendor |
| Comcast Total | (6,002.32) | Supplier or Vendor |
| Comnet Communications Total | (1,606.65) | Supplier or Vendor |
| COVR Total | (1,797.00) | Supplier or Vendor |
| Direct Supply Total | (1,008.42) | Supplier or Vendor |
| Elite Nurses Inc Total | (32,594.84) | Supplier or Vendor |
| Enviropest Total | (937.00) | Supplier or Vendor |
| Everest Reinsurance Company Total | (3,890.00) | Supplier or Vendor |
| First National Bank Total | (43,820.04) | Secured Lender |
| Flood & Peterson Insurance Total | (613.00) | Supplier or Vendor |
| Front Range Therapy Systems Total | (217,613.36) | Supplier or Vendor |
| Grainger Total | (847.36) | Supplier or Vendor |
| HD Supply Facilities Maintenance Total | (503.02) | Supplier or Vendor |
| Horizon Med Staffing Total | (11,546.16) | Supplier or Vendor |
| Interim Total | (21,920.64) | Supplier or Vendor |
| Lakeview Commons Total | (493.68) | Supplier or Vendor |
| Margie Metcalf c/o Janet Barczewski Total | (4,993.23) | Supplier or Vendor |
| Marvel Medical Staffing Total | (8,784.25) | Supplier or Vendor |
| Maxim Healthcare Staffing Services Inc Total | (57,613.43) | Supplier or Vendor |
| Mckee Medical Center Total | (298.18) | Supplier or Vendor |
| MD Supply Facilities Maintenance Total | (238.39) | Supplier or Vendor |
| Medical Center of the Rockies Total | (169.01) | Supplier or Vendor |
| Medical Systems of Denver Inc Total | (307.44) | Supplier or Vendor |
| Office Depot Credit Plan Total | (1,009.01) | Supplier or Vendor |
| Pacific Mobile Diagnostics Total | (2,394.92) | Supplier or Vendor |
| Penner Patient Care, Inc Total | (321.37) | Supplier or Vendor |
| Pet Imaging of Northern Co Total | (2,129.75) | Supplier or Vendor |
| Pinnacle Consulting, LLC Total | (270.00) | Supplier or Vendor |
| Pitney Bowes Global Fin Service Total | (490.32) | Supplier or Vendor |
| Poudre Valley Health Care Inc Total | (313.51) | Supplier or Vendor |
| Purchase Power Total | (1,057.63) | Supplier or Vendor |
| Redline Fire Services LLC Total | (589.00) | Supplier or Vendor |
| Republic Services #642 Total | (2,539.62) | Supplier or Vendor |

**Form b 207**

**Part 2: List Certain Transfers Made Before Filing for Bankruptcy**

**3. Certain payments or Transfers to Creditors within 90 Days of Filing**

| Creditor Name | Amount | Reason |
|---|---|---|
| Riveria Finance Total | (15,233.43) | Supplier or Vendor |
| Rolling Stone LLC Total | (1,986.27) | Supplier or Vendor |
| Royal Crest Dairy Inc. Total | (3,013.81) | Supplier or Vendor |
| Smart Document Management Total | (631.50) | Supplier or Vendor |
| Sof-tech Maintenance Co. Total | (978.60) | Supplier or Vendor |
| Stanley Healthcare Solutions Total | (6,005.30) | Supplier or Vendor |
| Stuart Fire & Security Total | (597.97) | Supplier or Vendor |
| The Home Depot Pro Total | (1,925.88) | Supplier or Vendor |
| Thompson Valley EMS Total | (775.00) | Supplier or Vendor |
| Tiger Inc Total | (19,178.50) | Supplier or Vendor |
| Tra Mar Mechanical, Inc. Total | (2,192.64) | Supplier or Vendor |
| Trudiligence Total | (2,413.66) | Supplier or Vendor |
| UCHealth Medical Group Total | (109.03) | Supplier or Vendor |
| Underwater Wonders Total | (1,197.45) | Supplier or Vendor |
| University of Co Health Lab Total | (6,087.93) | Supplier or Vendor |
| VCPI Total | (16,240.23) | Supplier or Vendor |
| Vegetation Management Resources Total | (735.00) | Supplier or Vendor |
| Visiting Ancillary Services Total | (295.64) | Supplier or Vendor |
| West-Chem Total | (488.68) | Supplier or Vendor |
| Workwell Occupational Medicine Total | (46.00) | Supplier or Vendor |
| TSYS | (4,251.64) | Supplier or Vendor |
| Total | $ (2,280,576.68) | |

EXHIBIT C

**Form b 207**

**Part 2: List Certain Transfers Made Before Filing for Bankruptcy**

**4. Payments or other transfers of property made within 1 year filing this case to or for insiders**

| Payee | Grand Total | Comments |
|---|---:|---|
| J Robert Wilson | (964,964) | Payments to insider |
| Centre Ave Health & Rehab | (6,273) | Suppliers or vendors owned by shareholder. |
| Centre Elderly Transportation | (117,118) | Payments to insider owned entity. |
| Centre Pharmacy | (352,523) | Payments to insider owned entity. |
| Columbine Commons Health & Reh | (300) | Payments to insider owned entity. |
| Columbine Distribution Centre | (325,600) | Payments to insider owned entity. |
| Columbine Health Systems | (2,721,851) | Payments to insider owned entity. |
| Columbine Medical Equipment | (177,053) | Payments to insider owned entity. |
| Front Range Geriatric Medicine | (35,190) | Payments to insider owned entity. |
| Front Range Therapy Systems | (1,202,205) | Payments to insider owned entity. |
| Geriatric Education Center | (10,324) | Payments to insider owned entity. |
| Lakeview Commons | (3,009) | Payments to insider owned entity. |
| Lemay Avenue Health and Rehab | (1,399) | Payments to insider owned entity. |
| Poudre Infusion Therapy | (110,662) | Payments to insider owned entity. |
| Wexford | (1,500) | Payments to insider owned entity. |
| Wilson Rentals | (100,000) | Payments to insider owned entity. |
| The Winslow | (1,823) | Payments to insider owned entity. |
| Grand Total | $  (5,166,829) | |

**EXHIBIT D**

## EXHIBIT A

Case No. 23-10809 - North Shore Manor Inc.

| CLAIMANT | SCHEDULED AMOUNT | PROOF OF CLAIM |
|---|---|---|
| United Helthcare Insurance Company | | $313.05 |
| Visiting Ancillary Services, Inc. | $0.00 | $3,631.87 |
| J. Robert Wilson | $610,000.00 | $510,000.00 |
| Centre Elderly Transportation, Inc. | $9,985.00 | $24,448.95 |
| Columbine Distribution Center, LLC | $28,818.00 | $57,889.28 |
| Columbine Management Services, Inc. | | $232,485.86 |
| Columbine Medical Equipment, Inc. | $17,098.00 | $34,038.95 |
| Front Range Geriatric Medicine, LLC | $2,928.00 | $8,250.00 |
| Front Range Therapy Systems Inc. dba Columbi | $117,406.00 | $225,887.61 |
| Geriatric Education Center LLC | $337.00 | $1,101.18 |
| Poudre Infusion Threrapy, LLC | $28,809.00 | $47,303.71 |
| Maxim Halthcare Staffing Services, Inc. | $22,628.00 | $27,056.50 |
| Soukup Bush & Associates, CPAs, P.C. | $55.00 | $2,250.00 |
| Columbine Management Services, Inc. | | $41,078.50 |
| Centre Pharmacy | $40,099.00 | $70,254.07 |
| North Shore Associates | $613,000.00 | $724,963.25 |
| PRN Health Services, LLC | | $2,431.00 |
| Centers for Medicare and Medicaid | $33,902.00 | |
| Columbine Health Systems | $32,412.00 | |
| Anthem Blue Cross Blue Shield | $26,784.00 | |
| Riviera Finance | $11,996.00 | |
| Tiger Inc. | $12,128.00 | |
| State of Colorado | $6,984.00 | |
| VCPI | $6,313.00 | |
| Mosaic HCM | $2,706.00 | |
| Tech Electronics | $2,205.00 | |
| Marvel Medical Staffing c/o ANB | $1,800.00 | |
| Pacific Mobile Diagnostics | $1,697.00 | |
| Delta Dental | $1,515.00 | |
| Securities Tech Corporation | $1,265.00 | |
| Front Range Duct Cleaning | $1,205.00 | |
| Republic Services #642 | $1,003.00 | |
| Royal Crest Dairy Inc. | $940.00 | |
| Interim Healthcare of Fort Collins | $936.00 | |
| University of CO Health Lab | $928.00 | |
| Nursed PRN | $825.00 | |
| CHS Workers Comp Fund | $783.00 | |
| Grainger | $563.00 | |

| | |
|---|---|
| Underwater Wonders | $549.00 |
| Rocky Mountain Reserve | $508.00 |
| The Imaging Center | $393.00 |
| All State Pumping & Consulting | $379.00 |
| CIGNA | $329.00 |
| Nelson & Kennard | $325.00 |
| Centruy Link 496B | $279.00 |
| Mountain Sales and Service | $270.00 |
| Trudiligence | $263.00 |
| Smart Document Management | $261.00 |
| Alsco-Laramie | $230.00 |
| Orthopedic Center of the Rockies | $213.00 |
| Medical Systems of Denver Inc. | $206.00 |
| Florida State Disbursement Unit | $204.00 |
| Enviropest | $166.00 |
| Wexford | $150.00 |
| Workwell Occupational Medicine | $138.00 |
| CCSD-Alaska | $125.00 |
| Pinnacle Consulting | $110.00 |
| Allstate Benefits | $109.00 |
| RF Technologies. Inc. | $96.00 |
| Aniance Protection, Ltd | $7.00 |

| | | |
|---|---|---|
| **TOTAL** | **$1,645,363.00** | **$2,013,383.78** |
| **TOTAL CLAIMS ASSERTED** | | **$2,167,583.78** |

Total claims asserted is comprised of the "scheduled amount"
except if a proof of claim is filed, in which case the proof of claim
 is considered in determing the total claims asserts

**EXHIBIT E**

1.    The Debtor shall retain a broker ("Broker") to market and sell substantially all of its assets and business operations ("Assets").

2.    The Broker shall market the Debtor's assets and to the extent that any offers are received, the Broker shall within 90 days of its retention (the "Stalking Horse Deadline").

3.    If the Broker does not produce any offers that are acceptable to the Debtor in its sole and absolute discretion by the Stalking Horse Deadline, then the Debtor may terminate the sale process.

4.    If the Debtor accepts an offer by the Stalking Horse Deadline, the Broker in conjunction with the Debtor, shall identify an initial bidder (the "Stalking Horse Bidder") for substantially all of the Debtor's assets (the "Assets"), whose offer shall be subject to higher or otherwise better competitive bids (the "Stalking Horse Bid").

5.    After identification of the Stalking Horse Bidder, the Broker shall continue to market the Assets for an additional 90 days (the "Bid Materials Deadline").

6.    An auction shall be conducted (the "Auction") in the event the Debtor receives multiple Qualified Bids (as defined below) for the Assets.

7.    Set forth below are the proposed procedures to be employed with respect to the sale of the Assets to the Successful Bidder (as defined below), which are designed to facilitate a full and fair process and maximize the value of the Assets for the benefit of the Debtor's creditors and bankruptcy estate.

Bidders

8.    In order to participate in the sale process, each interested person or entity (a "Bidder") must deliver (unless previously delivered) to Debtor and the Broker the Required Bid Materials (as defined and detailed below).

9.    A Bidder that delivers the Required Bid Materials whose financial information demonstrates the financial capability of the Bidder to consummate the sale, and that Debtor, in consultation with the Broker, determines is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale within an acceptable time frame shall be deemed a " Qualified Bidder."  The bid shall be deemed a "Qualified Bid."

Required Bid Materials

10.    All bids must be received by the Bid Deadline (as defined below) and include the following information and documents (the "Required Bid Materials"):

(i)    A letter stating (A) the purchase price proposed to be paid by the Bidder, (B) that such Bidder is prepared to enter into a legally binding purchase agreement, (C) that the Bidder's offer is irrevocable until the Assets on which the Bidder is submitting a bid have been sold pursuant to the closing of the sale, unless such Bidder is deemed to have submitted the Successful Bid or the Back-up Bid (each as defined below) in accordance with these procedures, in which case such Bidder's offer is irrevocable until two (2) business days after the closing (D) any amount of a credit bid by a secured creditor of the Debtor; and (E) that such bid is unconditional and is not subject to any financing contingency.

(ii)    An executed confidentiality agreement in form and substance acceptable to Debtor;

(iii)    The most recent financial statements of the Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current financial statements of the equity holder(s) of the Bidder, and such other financial disclosure acceptable to, or requested by, the Debtor, which information shall demonstrate the financial capability of the Bidder to consummate the purchase of the Assets (including evidence that the Bidder has adequate financing for the transaction), including without limitation, financial statements that are either audited by outside accountants or an authorized representative of the Bidder shall certify that the financial statements required hereby are true and correct;

(iv)    In the event the Debtor enters into a purchase agreement with a Stalking Horse Bidder, the purchase price submitted by any Bidder must be equal to or greater than the sum of (a) the purchase price set forth in such purchase agreement, (b) any break-up fee, (c) any expense reimbursement and (d) the Overbid Amount (as defined below).

(v)    In addition, in the event a Stalking Horse Bidder is designated for the Assets, a duly executed copy of a purchase agreement and a redline of the Bidder's proposed purchase agreement over that of the purchase agreement with the Stalking Horse

Bidder. If no Stalking Horse Bidder is designated for the Assets, a duly executed copy of a proposed purchase agreement. A commitment to close on the sale as soon as reasonably practicable following the entry of the order approving the sale.

(vi)    A deposit (a "Deposit") in the amount of 10% of the purchase price proposed by the Bidder made payable to Broker, which shall be maintained by Broker in a segregated account, not subject to the claims, liens, security interests or encumbrances of any party. Deposits shall be returned to all Bidders other than the bid for the Assets that is deemed to be the highest and best offer(s) (the "Successful Bid" and the "Successful Bidder") and the second highest and best offer for the Assets (the "Back-up Bid" and the "Back-up Bidder") within three (3) business days after entry of the order approving the sale. If the sale of the Assets to the Successful Bidder closes, the Successful Bidder's Deposit shall be applied to the purchase price at closing in accordance with the purchase agreement between the Debtor and such Successful Bidder, and, within three (3) business days after the closing of the Assets to the Successful Bidder, the Back-up Bidder's Deposit shall be returned to it. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder and the Debtor is not then in material breach of the purchase agreement, the Debtor will not have any obligation to return the Deposit deposited by such Successful Bidder and such Deposit irrevocably will become the property of the Debtor and shall not be credited against the purchase price of the subsequent buyer (in addition to the Debtor reserving all other rights and remedies against the Successful Bidder). In such instance, the Back-up Bidder's deposit shall be applied to the purchase price at closing of the sale with the Back-up Bidder;

(vii)   A list of the Debtor's executory contracts and unexpired leases with respect to which the Bidder seeks assignment from the Debtor (the Debtor makes no representations that any contracts or leases are assignable);

(viii)  For bids that are not a Stalking Horse Bid, a written acknowledgement that its bid is not conditioned upon any bid protections, such as a  break-up fee, termination fee, expense reimbursement or similar type of payment;

(ix)    Written evidence of the Bidder's available cash or a commitment for financing or other evidence of proposed purchaser's ability to consummate the proposed transaction;

(x)     Full disclosure of the identity of each entity or person is a part the Bidder that is bidding for the Assets or otherwise participating with such bid, and the complete terms of any such participation; and

(xi)    Evidence that the Bidder has the necessary internal authorizations and approvals necessary to engage in the transaction without the consent of any entity that has not already been obtained.

11.   A Bidder that desires to be participate at the Auction shall on or before the Bid Materials Deadline deliver written and electronic copies of its Required Bid Materials, except that the Deposit shall be delivered only to Broker, to:

> DEBTOR CONTACT INFO
>
> BROKER CONTACT INFO

12.   Any Bidder that provides a Qualified Bid by the Stalking Horse Bidder Deadline shall be permitted to be considered as a Stalking Horse Bidder.   Any Bidder that provides a Qualified Bid by the Bid Materials Deadline shall be permitted to participate at the Auction.

Designation of Stalking Horse Bidder

13.   The Debtor shall designate the highest and best Qualified Bid and the Bidder shall be deemed the Stalking Horse Bidder for the purpose of establishing a minimum acceptable bid with which to begin the bidding at the Auction.

The Auction and Auction Procedures

14.   If more than one Qualified Bid has been timely received by the Debtor for the Assets, the Debtor shall conduct the Auction for the Assets.

15.   The Auction shall be conducted at the offices of Broker or as otherwise designated by the Debtor in writing to every Bidder.

16.   Only the Debtor, its counsel, the Broker, and Qualified Bidders will be entitled to attend, participate and be heard at the Auction, and only Qualified Bidders will be entitled to make any subsequent overbids at the Auction. Each Qualified Bidder will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale. The Auction shall be an open bidding process in the presence of all other Qualified Bidders for a particular Lot.

17.   The Debtor may permit a Qualified Bidder to bid by telephone, in person or any combination thereof.

4

18.   At the commencement of the Auction, bidding will begin at the purchase price stated in the highest or otherwise best Qualified Bid for the Assets, and will subsequently continue in minimum increments of at least $50,000 higher than the previous Qualified Bid (the "Overbid Amount"), plus the initial Overbid Amount shall include any break-up fee and expense reimbursement of $20,000. The bidding shall not end until all bidders have submitted their last and best offers.

19.   As soon as practicable after the conclusion of the Auction, Debtor and the Broker shall (i) review each Qualified Bid on the basis of the financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale and (ii) identify the highest or otherwise best offer for the purchase of the Assets and the second highest and best offer for the purchase of the Assets.

Acceptance of Qualified Bids

20.   The Debtor shall sell the Assets to the Successful Bidder.

21.   The Debtor, in consultation with its Broker, shall determine which Qualified Bid, if any, is the highest or otherwise best offer.

22.   If such Successful Bidder fails to consummate an approved Sale, the Debtor is authorized to deem the Back-up Bid as the Successful Bid, and the Debtor is authorized, but not required, to consummate the sale with the Back-up Bidder.

Modifications

23.   The Debtor may amend or supplement these Sale Procedures at any time in any manner that is consistent with these Sale Procedures and will best promote the goals of the sale process.

**EXHIBIT F**

**DRAFT FIVE YEAR PROJECTIONS**
**NORTH SHORE MANOR INC**

| | Reference | Monthly Estimate | Year 1 5/31/2024 | Year 2 5/31/2025 | Year 3 5/31/2026 | Year 4 5/31/2027 | Year 5 5/31/2028 |
|---|---|---|---|---|---|---|---|
| Projected Revenues | [a] | $ 1,100,000 | $ 13,200,000 | 13,596,000 | 14,139,840 | 14,776,133 | 15,514,939 |
| | | | | | | | |
| Interim CEO | [a] | 75,000 | 450,000 | | | | |
| Permanent CEO | [a] | | | 250,000 | 250,000 | 225,000 | 200,000 |
| Management Company | [c] | 60,000 | 726,000 | 747,780 | 777,691 | 812,687 | 853,322 |
| Rent | [b] | 70,000 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 |
| Payroll and Benefits | [a] | 600,000 | 7,200,000 | 7,632,000 | 8,089,920 | 8,575,315 | 9,089,834 |
| Contract Labor & Outside Services | [a] | 75,000 | 900,000 | 945,000 | 992,250 | 1,041,863 | 1,093,956 |
| Administrative/Office | [a] | 33,000 | 396,000 | 407,880 | 420,116 | 432,720 | 445,701 |
| Food/Dietary | [a] | 45,000 | 540,000 | 556,200 | 572,886 | 590,073 | 607,775 |
| Supplies | [a] | 50,000 | 600,000 | 618,000 | 636,540 | 655,636 | 675,305 |
| Utilities | [a] | 18,000 | 216,000 | 222,480 | 229,154 | 236,029 | 243,110 |
| Insurance | [e] | 18,650 | 223,800 | 230,514 | 237,429 | 244,552 | 251,889 |
| Property and Real Estate Taxes | [e] | 3,865 | 50,000 | 51,500 | 51,500 | 53,045 | 53,045 |
| Legal and professional | [f] | 2,917 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 |
| Other taxes | [g] | 30,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 |
| Activities/miscellaneous/ allocated costs | [a] | 15,000 | 180,000 | 185,400 | 190,962 | 196,691 | 202,592 |
| Capital expenditures | [g] | 25,000 | 175,000 | 125,000 | 25,000 | 25,000 | 25,000 |
| Debt Service | [d] | 8,133 | 97,595 | 97,595 | 97,595 | 97,595 | 90,242 |
| Repairs and Maintenance | [a] | 5,400 | 64,800 | 68,040 | 71,442 | 75,014 | 78,765 |
| | | 1,134,964 | 13,054,195 | 13,372,389 | 13,877,486 | 14,496,220 | 15,145,535 |
| | | | | | | | |
| Projected Cash Flow | | | 145,805 | 223,611 | 262,354 | 279,913 | 369,404 |
| Distribution to Unsecured Creditor Pool | | $ 2,167,584 | 145,805 | 223,611 | 262,354 | 279,913 | 369,404 |
| Annual Distribution % to Unsecured Creditor Pool | | | 6.7% | 10.3% | 12.1% | 12.9% | 17.0% |
| Cummulative Distribution % to Unsecured Creditor Pool | | | 17% | 17% | 29% | 42% | 59% |
| | | | | | | | |
| Beginning Cash | | | 1,210,838 | 960,838 | 835,838 | 735,838 | 660,838 |
| Cash flow from operations | | | 145,805 | 223,611 | 262,354 | 279,913 | 369,404 |
| Distribution to Unsecured Creditor Pool | | | (145,805) | (223,611) | (262,354) | (279,913) | (369,404) |
| Chapter 11 professional fees/admin claims/cure | | | (250,000) | (125,000) | (100,000) | (75,000) | (50,000) |
| Ending Cash | | | $ 960,838 | 835,838 | 735,838 | 660,838 | 610,838 |

(a) Estimated based on post-petition year to date analysis.

Interim CEO costs expected to decline as facility stabilizes

Revenue expected to grow at 3%, 3.5%, 4.0%, 4.5% and 5% in 2024, 2025, 2026, 2027 and 2028 respectively.

Administrative/office, insurance, food and dietary, supplies,activities, and utilities expenses expected to grow at 3.0% per year.

Payroll expected to grow at 6.0% per year.

Contract labor and outside services, repairs and maintenance expenses expected to grow at 5% per year.

(b) Under contract 5.5% of collected revenue.

(c) Per lease.

(d) Note is at 8% assuming five year amortization.

(e) Estimate based on post-petition activity as compared to prior year tax return. Property and real estate taxes are estimated to increase 5% every two years.

(f) Estimated ordinary course legal and professional at $35,000 based on historical costs for outside accountants.

(g) Capital expenditures expected for new van and facility upgrades.